DARR et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.

No. 287, Docket 21011.

Circuit Court of Appeals. Second Circuit.
July 8, 1948.

Writ of Certiorari Denied Nov. 22, 1948.
See 69 S.Ct. 166.

---

Stanley Faulkner, of New York City, for plaintiffs-appellants.

Louis W. Dawson, of New York City (Haughton Bell, Joseph V. Lane, Jr., of New York City, of counsel), for defendant-appellee.

Duberstein & Nimkoff, of New York City (Frederick E. Weinberg, Wilbur Duberstein and Max R. Simon, all of New York City, of counsel), for Frank Asselta, et al., amici curiae.

Tom C. Clark, Atty. Gen., H. G. Morison, Asst. Atty. Gen., George L. Grobe, U. S. Atty., of Buffalo, N. Y., John F. X. McGohey, U. S. Atty., of New York City, Enoch E. Ellison, Sp. Asst. to the Atty. Gen., and Johanna M. D'Amico, Atty., Department of Justice, of Washington, D. C., for United States as Intervenor.

Before SWAN, AUGUSTUS N. HAND and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This is an appeal by the plaintiffs from a judgment of the District Court for the Southern District of New York in a suit for overtime wages and liquidated damages, together with reasonable attorney's fees, pursuant to section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b). It presents two principal questions for decision. The first is whether that Act, 52 Stat. 1060–1069, 29 U.S.C.A. §§ 201–219, covers employees of a life insurance company who are engaged in the operation and maintenance of the company's home office buildings in the City of New York; the second is whether, if so, sections 9 and 11 of the Portal-to-Portal Act of 1947, 61 Stat. 84–90, 29 U.S.C.A. §§ 251–262, are constitutional.

The appellants are elevator operators, one elevator starter, and one assistant janitor, all of whom worked for the appellee before, during, and after the period for which recovery was sought. They performed in the home office buildings of the appellee the kind of service such employees in office buildings usually perform. The appellee is a large life insurance company incorporated under the laws of New York and doing business in every state in the Union except Texas. Its home office in the City of New York is located in adjoining buildings which it owns and which cover practically a city block. They have a gross rental area of about 365,000 square feet. The appellee occupies and uses in its business approximately 275,000 square feet, or about 76% of this area, the remainder being rented to tenants who are not, so far as this record shows, engaged either in interstate commerce or in the production of goods for interstate commerce.

The trial court found upon adequate evidence that the appellee "enters into and performs" a large number of life insurance contracts and takes all the steps usually required in so doing, acting through its soliciting agents, its branch offices, and its home office. These are in general as follows. The necessary blank forms are supplied from the home office to the branch offices and thence to soliciting agents who obtain applications for insurance from the public. These applications are returned to the branch office in the territory where they are obtained and a medical examination of the prospect is made by a designated doctor who makes a report on a blank furnished to him by the appellee through its branch office. This report is sent to the branch office by the doctor and then the application and the medical report are sent to the home office of the appellee. There the application and report are given due consideration in what is called the selection department to determine whether the application will be accepted and a policy of insurance issued. If the risk is accepted, the papers are passed to another department where what is called a policy form is filled in by a typist with the necessary information to make it an insurance policy; the application is photostated and a photostatic copy of it is attached to the policy, all of which is then checked to eliminate errors. This completed policy is afterwards sent to the proper branch office together with an "initial-premium-paid" form. The branch office then turns the policy over to the original soliciting agent who in turn delivers it to the insured, provided the premium then due is, or has already been, paid. If it is paid upon de-

livery of the policy, the initial-premium-paid form is stamped at the branch office to show the payment. When, as sometimes happens, the applicant pays the first premium in whole or in part in advance the subsequent collection procedure is varied accordingly. The appellee does not itself print any of the forms used in its business but buys them all from independent printers. It uses 1109 square feet of space in its home office for photostating applications and about 816 square feet for the typists who fill out the forms which become insurance policies and are sent to branch offices for delivery to the applicants.

■ The decisions which we are bound to follow lead us to the conclusion that the Fair Labor Standards Act does cover these plaintiffs. In United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, it was held that insurance business conducted across state lines in substantially the way the appellee conducts its business was subject to regulation by Congress under the commerce clause. While that, perhaps, is not wholly determinative of the question whether insurance policies are "goods" within the meaning of section 3(i) of the Fair Labor Standards Act, 29 U.S.C.A. § 203(i), it does show that the issuance of such policies may be a part of interstate commerce and supersedes such decisions as Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357, and New York Life Ins. Company v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332, to what may previously have been thought to be the opposite effect. Apparently the South-Eastern Underwriter's case went on the broad ground that Congress had the power to regulate the flow across state lines of the end result of a nation-wide "commercial enterprise" despite the fact that that enterprise dealt only in the creation and delivery of instruments establishing intangible rights and the subsequent performance of the obligations so created. However that may be, it tends to show, we think, that insurance policies may be "subjects of commerce." Cf. Stone, C. J., dissenting in United States v. South-Eastern Underwriters Ass'n, 322 U.S. at 562, 64 S.Ct. at 1178, 88 L.Ed. 1440, et seq. The appellee, doing a business subject to regulation by Congress under the commerce clause, makes insurance contracts by doing work upon the policies, necessary to the creation of the contract, at its home office. It is true that the contract of insurance may become effective without delivery of the policy to the applicant, provided payment of the initial premium has been made in advance, Ruhlin v. New York Life Ins. Co., 3 Cir., 106 F.2d 921, certiorari denied, 309 U.S. 655, 60 S.Ct. 469, 84 L.Ed. 1005, so that in this respect the policy may be only "evidence" of the obligation. Nevertheless, after three years of premiums are paid the policy may be used as security for a loan from the company or be surrendered for its cash value. Moreover, provided insurable interest requirements are met, the policy may be assigned at any time to third parties. These things being true we think it cannot be said that the policy is merely "evidence" of the obligation.[1] The broad definition of "goods" contained in section 3 of the Fair Labor Standards Act includes "subjects of commerce of any character." We think, following Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414, that under the equally broad definition of "produced" in the Act,[2] these insurance policies are

[1] Cf. Bozart v. Bank of New York, 2 Cir., 156 F.2d 787, 790, where we said: "Last—and most important for the case before us—of the Bank's activities is the preparation or execution of commercial paper, whether documents of permanent investment, like shares of stock or bond issues, or shore term obligations, like negotiable notes, or documents which are strictly speaking not obligations at all, but bills of lading, and the like. All these the law is disposed to think of, not as records of rights of action, but as the very rights themselves. Bonds have never been considered only as evidences of obligation; from the earliest times they have been treated as the very obligations, and that notion persists.* * * It by no means unduly strains § 203(j) to regard the preparation, execution or other validation of such documents as the actual 'production of goods.'"

[2] Section 3(j) defines "produced" to mean "produced, manufactured, mined,

goods produced for commerce, indeed, as much so as the commercial paper held to be such in Bozant v. Bank of New York, 2 Cir., 156 F.2d 787, and for substantially the same reasons. See also Baldwin v. Emigrant Industrial Savings Bank, 2 Cir., 150 F.2d 524, 161 A.L.R. 1234, certiorari denied, 326 U.S. 767, 66 S.Ct. 171. Since maintenance employees like the plaintiffs are "necessary" to the production of such goods, they are within the coverage of the Fair Labor Standards Act. The case is a fortiori to Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, 161 A.L.R. 1258, where the "goods" were not "produced" at the office building in which the employees worked.

Decision on the second point requires a more complete statement of the nature of the suit and of the events which led up to the judgment from which this appeal was taken. Suit was brought on April 11, 1946 in behalf of the plaintiffs, and all other present and former employees of the defendant who were in similar situation, to recover for the period beginning April 12, 1940 and ending at the time when the defendant voluntarily began to pay the wages the plaintiffs claimed to be due them pursuant to the statute. That period was in part when the statute required overtime payment for hours worked in excess of 42 per week and in part when overtime consisted of all hours worked in excess of 40. The overtime for which compensation and liquidated damages was claimed was made up partly of time spent in rest periods and none of it was compensable either under the terms of any contract or in accordance with any custom or practice. The suit was tried by court and after finding the pertinent facts the trial judge filed conclusions of law indicating that judgment would be entered for the plaintiff for overtime pay and liquidated damages for the excess time plaintiffs actually worked but not for that spent in rest periods.[3] The amount of counsel fees was left for later determination if not settled by agreement. Before the entry of judgment the Portal-to-Portal Act of 1947 became effective, however, and the defendant then moved to have the case reopened and for leave to plead the new defenses available to it under sections 9 and 11 of that statute.[4] The motion was granted and the issues thus presented were tried.

The court then found on adequate supporting evidence that it had been the administrative practice and enforcement policy of the Wage and Hour Division of the

---

handled, or in any other manner worked on * * * ."

[3] As to time spent during rest periods the court found upon sufficient evidence that, "During these rest periods, throughout the time covered by the complaint and prior thereto, the time of the plaintiffs was their own just as fully as their lunch periods for which they never have been compensated, and they were free to leave the defendant's premises or to rest in a locker-room maintained for their comfort and convenience by the defendant on the premises." Consequently the rest period time is not compensable under the Act even as construed in the Mt. Clemens case, Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 694, 66 S.Ct. 1187, 90 L.Ed. 1515.

[4] Section 9 reads in part as follows: "In any action or proceeding commenced prior to or on or after May 14, 1947 based on any act or omission prior to May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, * * * if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. * * * " 29 U.S.C.A. § 258.

Section 11 reads in part as follows: "In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages * * * " 29 U.S.C.A. § 260.

266

Department of Labor not to enforce the provisions of the Fair Labor Standards Act in the insurance business before December 6, 1940, the date upon which the appellee voluntarily complied with them; that enforcement of the statute in the insurance business was not attempted by that agency prior to February 10, 1942; that, in failing to make the payments for overtime worked—as distinguished from rest period time—for which the plaintiffs sued, the defendant acted in good faith in the belief based upon reasonable grounds that the statute did not cover its employees; and it so acted in conformity with and in reliance upon the above-mentioned administrative practice and enforcement policy of the Wage and Hour Division. It was held that the sections of the Portal-to-Portal Act relied on to defeat the claim for overtime worked were not unconstitutional and that section 9 was a complete defense to that claim. Furthermore, it was held as a matter of discretion that no liquidated damages should, in any event, be awarded in view of the provisions of section 11. Consequently final judgment was entered for the defendant, but without costs. The appeal is from that judgment.

■ We need now make no distinction between section 9, which bars the claim, and section 11, which allows the elimination of liquidated damages in the discretion of the court, for if one is valid the other is also. Both were passed by Congress as a part of an act to regulate interstate commerce, a subject exclusively within the legislative power of the national government. The Portal-to-Portal Act followed Congressional investigation and findings of facts concerning the effect upon commerce of the Fair Labor Standards Act, as that statute had been construed by the Supreme Court, as shown in our opinion in Battaglia et al. v. General Motors Corporation, 169 F.2d 254. We there discussed the constitutionality of the statute with especial reference to the then applicable section 2, and held that it was valid notwithstanding the fact that it obliterated causes of action for overtime pay, liquidated damages, and counsel fees, which had accrued under the Fair Labor Standards Act previous to the enactment of the Portal-to-Portal Act. The reasons which induced us to reach that conclusion in the General Motors case are pertinent here, for all three sections are but an exercise of the same power, differing only in method of application, and we refer to our opinion in that case without repetition. We hold, therefore, as did the Sixth Circuit in Rogers Cartage Co. v. Reynolds, 166 F.2d 317, that, even if appellants' rights are considered as contractual, these two sections are a valid exercise of the constitutional power of Congress to legislate in the field of interstate commerce and that section 9 bars recovery on this claim while section 11 was properly, though—in view of the effect of section 9—unnecessarily, applied to defeat recovery of liquidated damages.

Judgment affirmed.