W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

COLUMBIAN MUTUAL LIFE INSURANCE COMPANY, a Corporation, Defendant.

Civ. No. 4955.

United States District Court
W. D. Tennessee, W. D.

Oct. 2, 1965.

———◆———

Charles Donahue, Solicitor, James B. Leist, Washington, D. C., Counsel for Regional Litigation, Jeter S. Ray, Regional Atty., David V. Manker, Deputy Regional Atty., Bobbye D. Spears, Nashville, Tenn., for plaintiff.

Neely, Green & Fargarson, Memphis, Tenn., for defendant.

BAILEY BROWN, District Judge.

This is an action by the Secretary of Labor under Sec. 17 of the Fair Labor

Standards Act of 1938, as amended (29 U.S.C.A. § 217) to enjoin the defendant, Columbian Mutual Life Insurance Co., from failing to pay and from withholding the payment of minimum wage and overtime compensation required by Secs. 6(b), 7(a) (2) and 15(a) (2) of the Act (29 U.S.C.A. §§ 206(b), 207(a) (2) and 215(a) (2)) and from failing to maintain the records required by Secs. 11(c) and 15(a) (5) of the Act (29 U.S.C.A. §§ 211(c) and 215(a) (5)). This action was tried without the intervention of a jury. The broad question presented is whether the service and custodial employees of a 21-story office building owned by the defendant insurance company, which is occupied in part by its home office, are covered employees by virtue of 1961 amendments to the Act. It is conceded by defendant that minimum wage and overtime compensation has not been paid to these building employees and that the records prescribed by the Act have not been maintained with respect to these employees.

Prior to the 1961 amendments, coverage of an employee by the Act depended upon his own relation to interstate commerce, that is to say, an employee was not covered unless he was "engaged in commerce or in the production of goods for commerce." Secs. 6(a) and 7(a) (29 U.S.C.A. §§ 206(a) and 207(a)) The 1961 amendments (enacted September 3, 1961) broaden the coverage to include certain employees who are themselves not engaged in commerce or in the production of goods for commerce; and the minimum wage and overtime requirements are gradually applied to these newly-covered employees. It is upon these provisions that the Secretary relies in asserting coverage.

By Secs. 6(b) and 7(a) (2) of the Act (29 U.S.C.A. §§ 206(b) and 207(a) (2)), this new coverage applies to an employee who in any workweek " * * * is employed in * * * an establishment described in section 3(s) (3) * * * ", and who, except for the enactment of the 1961 amendments, would not be a covered employee.

Sec. 3(s) (3) (29 U.S.C.A. § 203(s) (3)) provides:

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

\* \* \* \* \*

(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000; * * *."

Sec. 3(r) of the Act (29 U.S.C.A. § 203(r)), which defines an "enterprise," provides in relevant part:

"(r) 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: * * *."

■ It will be seen that there can be no coverage under Sec. 3(s) (3) unless, among other things, "the annual gross volume of sales of such enterprise is not less than $1,000,000." This requirement raises two questions. The first question is whether the office building and home office activities of the defendant insurance company together constitute an "enterprise" within the meaning of Sec. 3(r). If they do not, there could be no coverage, because the building does not have annual "gross

sales," however defined, of $1,000,000. If they do constitute an enterprise, the second question is: what part of the gross receipts of the defendant insurance company from the building and insurance activities constitute "gross sales" within the meaning of Sec. 3(s) (3)? We address ourselves first to the question whether the office building and home office activities constitute an "enterprise."

Under Sec. 3(r), the office building and home office activities constitute an enterprise if (1) they are related activities, and (2) they are performed either through unified operation or common control, and (3) they are performed for a common business purpose.

The "common control" requirement is clearly met here. The defendant insurance corporation owns both the building (actually it has a 99 year lease) and the insurance business. There is only one legal entity. More importantly, while defendant has an agreement with an agent to perform certain management services, defendant retains the right (1) to approve employment of building employees and to have them removed, (2) to fix and pay wages of these employees, (3) to have an equal voice in determining rent charged, (4) to approve leases and tenants, (5) to approve requisitions for supplies, (6) to approve the institution of litigation, (7) to prescribe rules and regulations for operation of the building, and (8) to approve alterations in the floor plans. Moreover, defendant has exercised these rights reserved to it in the agreement with the agent.

The question whether the office building and home office activities are "related" is more difficult, but the legislative history is of some aid. In Senate Report No. 145, U.S.Code Congressional & Administrative News (1961), p. 1660, it is said:

"The bill's approach is to treat as separate enterprises those businesses which are unrelated to each other. For example, if a single company owns several retail apparel stores and is also engaged in the lumbering business, the sales of the lumbering business would not be included in the annual dollar volume in determining whether the $1 million test under section 3(s) (1) has been met. The employees of the lumbering business would not be included in the 'enterprise' even if the $1 million test were met since they are not engaged in the 'related activities' of the retail stores.

"Within the meaning of this term, activities are 'related' when they are the same or similar, such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. They are also 'related' when they are auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services. Likewise, activities are 'related' when they are part of a vertical structure such as the manufacturing, warehousing, and retailing of a particular product or products under unified operation or common control for a common business purpose."

We believe that the home office and office building activities are related within the meaning of Sec. 3(r) of the Act. The home office occupies about 11% of the space in the building and the remainder of the building is occupied by miscellaneous tenants. Ownership of the building therefore constitutes an outlet for investment of defendant's funds and also provides defendant with home office space. Defendant uses its ownership of the building to indicate to the public that it is a solid insurance company by using a picture of the building on its stationery and by calling the building the "Columbian Mutual Tower Building." Some of the employees of the building—superintendent, night superintendent, porters, and elevator operators—provide the same general services for defendant's home office as they do for the tenants. One of the building

maids cleans the defendant's home office space. One of the building porters frequently picks up the home office mail at the post office on Saturdays, Sundays and holidays. The building maintains a law library for its lawyer tenants and a telephone switchboard and answering service for tenants who desire and pay for this service. One female employee acts as librarian and switchboard operator, and she is relieved by home office employees each day for about two hours for lunch, coffee breaks and other purposes. While the rights reserved to defendant in its agreement with the management agent are generally exercised by defendant's building superintendent, he confers with defendant's president from time to time in exercising these rights. We would agree that if the defendant owned an office building which it did not in part occupy, or even if it did in part occupy the building, and if the connecting factors present here were absent, the operation of the building to the extent that it was not occupied by defendant might well be an unrelated activity. But here we have connecting factors which compel the conclusion that the activities are related.

In contending that these activities are not related, defendant relies on Wirtz v. Savannah Bank & Trust Co., 16 W H Cases 728, 51 L C § 31, 661 (S.D.Ga. 1964). This case is distinguishable at least on the ground that there the duties of the building employees were limited to the portions of the building leased to tenants. Defendant also relies in this connection on Wirtz v. First National Bank & Trust Co., 239 F.Supp. 613 (W.D.Okl.1965). In this case, it does not appear that there was as close a connection between the operation of the buildings and the operation of the bank as there is in the instant case; however, it does appear that the building employees there did perform the general services for the bank that they performed for the tenants. We therefore respectfully disagree with the holding that the building and banking activities were not related.

With respect to the question whether the home office and office building activities are performed for a common business purpose, the legislative history is of less aid. However, in reading that part of Senate Report No. 145 which has to do with the definition of an "enterprise," from which we have heretofore in part quoted, we gather that the requirement that they be performed for a common business purpose are not very different. See: U.S. Code Congressional & Administrative News (1961), p. 1659. The most definite statement made in this Report with respect to the meaning of "common business purpose" reads as follows (p. 1660):

> "Further, in order for 'related activities' to be part of an enterprise they must be performed for a 'common business purpose.' Eleemosynary, religious, or educational and similar activities of organizations which are not operated for profit are not included in the term 'enterprise' as used in this bill. Such activities performed by nonprofit organizations are not activities performed for a common business purpose."

This statements makes it clear that charitable activities are excluded by the word "business," but it is not of any aid in determining whether there is a "common" purpose.

We conclude that some of the same factors that we relied upon in determining that these activities are "related" also require the conclusion that they are performed for a "common business purpose." We believe this conclusion is compelled by the facts that the building constitutes an investment outlet, that it provides home office space and that defendant holds the building out to the public as one of its assets and as the seat of its home office. Defendant again relies on the Savannah Bank case, supra, and the First National Bank case, supra, which held that activities operated for a profit are not, because of that fact alone, operated for a common business purpose. This is no doubt true. But

in these cases, as here, the buildings involved furnished the banks with necessary office space. It is true that the defendant here, as did the banks there, occupies only part of the total office space, but the building is operated as a unit and therefore constitutes one "activity." In the instant case, we have the additional fact that defendant holds the building out to the public as its property and as its headquarters.

■■■■ In summary, then, we conclude that the home office and office building activities constitute an "enterprise" within the meaning of Sec. 3(r) of the Act. On this branch of the case, however, we must still determine whether, in accordance with the requirement of Sec. 3(s) (3), this enterprise has annual "gross sales" of $1,000,000.

The defendant's annual premium income for each of the years involved (1961, 1962, and 1963) was never as large as $1,000,000. Defendant contends that only premium income should be included in determining the amount of gross sales. The Secretary contends, on the other hand, that all of the following in addition should be included: (a) investment income consisting of (1) rent from the building, (2) interest on bonds, mortgage loans, policy loans, and bank deposits, and (3) dividends on stocks; and (b) proceeds from sales or exchanges of stocks and bonds. The inclusion of either investment income or proceeds from sales or exchanges would, if added to premium income, bring defendant's "annual gross volume of sales" to well over $1,000,000 for each year.

Sec. 3(k) of the Act (29 U.S.C.A. § 203(k)) defines a sale as follows:

"'(k) 'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.".

Defendant contends that proceeds from sales or exchanges of its bonds and stocks should not be included, although they would be if we literally apply this definition of a sale, because (1) it is not in the business of selling bonds and stocks and (2) these sales and exchanges

were made for purposes of reinvestment and therefore they amounted only to substitutions in its investment portfolio. Defendant contends that interest, dividends and rent should not be included because they do not fit into the quoted definition of a sale.

The legislative history is somewhat helpful here. It appears that, in establishing the $1,000,000 gross sales test, Congress intended to make coverage depend upon the size of the business, for in Senate Report No. 145, U. S. Code Congressional & Administrative News (1961), p. 1624, it is said:

"* * * The million dollar test is an economic test. It is the line which the Congress must draw in determining who shall and who shall not be covered by a minimum wage. It is a way of saying that anyone who is operating a business of that size in commerce can afford to pay his employees the minimum wage under this law."

Moreover, it appears that Congress intended that receipts resulting from transactions not fitting into the Sec. 3(k) definition of a sale would be included. The same Report indicates (p. 1650), in discussing Sec. 3(s) (4) (which became Sec. 3(s) (3) in the Act), that it was intended that "finance" companies, whose income would certainly be interest, could be covered, for it says:

"This section would provide minimum wage and overtime protection under the act for approximately 100,000 additional employees in such enterprises as wholesale trade, finance, insurance, real estate, transportation, communications, and public utilities, and business, accounting, and similar services."

Again, this Report indicates (p. 1657) that "sales" would include receipts for services rendered, for it says:

"Under the bill, an 'enterprise' in section 3(s) (1), (2), and (4) must have $1 million or more in annual sales. The method of calculating the requisite dollar volume of sales or

business will be the same as is now followed under the law with respect to calculating the annual dollar volume of sales in retail and service establishments, and in laundries under the exemptions provided in section 13(a) (2), (3), (4), and (13) of the act. The procedure for making the calculation is set forth in the Department's Interpretative Bulletin, title 29, Code of Federal Regulations, part 779, section 779.17. As it is there stated, the 'annual dollar volume of sales' consists of the gross receipts from all types of sales during a 12-month period."

The Act itself indicates in more than one instance that "gross sales" include receipts from services. For example, Sec. 3(s) (1) provides:

"(1) any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000 * * *."

It appears to us, therefore, that we must choose between a literal application of the definition of a "sale" contained in Sec. 3(k) of the Act, and an interpretation of "annual gross volume of sales" contained in Sec. 3(s) (3) which would carry out the intention of Congress (1) that coverage depend upon the size of the business and (2) that receipts would be included which do not result from transactions that could be called a sale under the Sec. 3(k) definition. We conclude that the clear intention of Congress should prevail. Accordingly, we believe that receipts from these sales and exchanges of stocks and bonds should not be included. The fortuitous circumstance of the amount of sales or exchanges of stocks and bonds for reinvestment in a particular year would be little, if any, indication of the size of the business. Nor would, for example, the sale of the office building be such an indication. On the other hand, the amount of investment income, along with the amount of premium income, does indicate the size of a life insurance business. Moreover, as has been shown, Congress

intended that such income be included even though it does not result from a transaction that satisfies the Sec. 3(k) definition of a sale. We therefore conclude that this investment income of defendant should be included in the "annual gross volume of sales" under Sec. 3(s) (3) of the Act. As stated, the total of this investment income and premium income far exceeds $1,000,000 each year.

We have thus determined that the office building employees are employed in an enterprise which has more than $1,000,000 of gross sales. We must next determine whether the other main requirement of Sec. 3(s) (3) is met, which is whether we have two or more employees engaged in commerce or in the production of goods for commerce.

It could at least be argued that, under a proper construction of Sec. 3(s) (3), it is sufficient if the "enterprise" rather than the "establishment" has two or more employees engaged in commerce or in the production of goods for commerce; and if this were true, we would have no problem since it is conceded that the home office employees are so engaged. (Defendant is correct in so conceding. See: Darr v. Mutual Ins. Co. of N. Y., 169 F.2d 262, 264 (2d Cir. 1948), cert. denied 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415 (1948), Union National Bank of Little Rock, Ark. v. Durkin, 207 F.2d 848, 850 (8th Cir. 1953)). The First National Bank case, supra, assumes that it is sufficient if the enterprise has employees so engaged. 239 F.Supp. 613, 617. However, the Secretary concedes that it is necessary that the establishment have such employees, and we believe the Secretary is correct in making this concession because the legislative history strongly so indicates. See: Senate Report No. 145 and Conference Report No. 327, Statement of the Managers on the Part of the House, U. S. Code Congressional & Administrative News (1961), p. 1650 and p. 1709.

■ On this branch of the case the Secretary makes two contentions: (1) that the home office and the office building are one establishment, and (2)

that even if the office building is a separate establishment, it has two or more employees who are engaged in commerce or in the production of goods for commerce.

The Supreme Court in A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095 (1945) defined an "establishment" for purposes of the Act " * * * as meaning a distinct physical place of business * * *." In Mitchell v. Gammill, 245 F.2d 207, 211 (5th Cir. 1957) the Court said, with respect to the meaning of the word "establishment" in the Act:

" * * * One of the indicia of an 'establishment' is a distinct physical place of business. A. H. Phillips, Inc., v. Walling, supra; McComb v. Wyandotte Furniture Co., 8 Cir., 1948, 169 F.2d 766. Another is a functional unity, Mitchell v. T. F. Taylor Fertilizer Works, 5 Cir., 1956, 233 F.2d 284, 286. * * *"

The Department of Labor has therefore issued an Interpretative Bulletin which defines an "establishment" as follows (29 C.F.R. Sec. 779.23):

"779.23   Establishment.

As used in the Act, the term 'establishment', which is not specially defined therein, refers to a 'distinct physical place of business' rather than to 'an entire business or enterprise' which may include several separate places of business. This is consistent with the meaning of the term as it is normally used in business and in government, is judicially settled, and has been recognized in the Congress in the course of enactment of amendatory legislation (Phillips v. Walling, 324 U.S. 490 [65 S.Ct. 807, 89 L.Ed. 1095]; Mitchell v. Bekins Van & Storage Co., 352 U.S. 1027 [77 S.Ct. 593, 1 L.Ed. 2d 589]; 95 Cong.Rec. 12505, 12579, 14877; H.Rept. No. 1453, 81st Cong. 1st Sess. p. 25). As appears more fully elsewhere in this part, this is the meaning of the term as used in sections 3(r), 3(s), 6(b), 7(h), 13(a), and 14 of the Act."

Here we believe that the office building and the home office constitute only one establishment, because they are one distinct physical place of business. Moreover, there is a functional unity. There is functional unity because, in addition to the services heretofore alluded to furnished by the building employees to the home office and the home office employees to the building, home office personnel maintain the records on the building employees, handle their group insurance, issue their paychecks and withhold and remit income tax and social security payments. Further, the home office contracts for all insurance on the building. Since there is only one establishment and since the home office has employees admittedly in commerce, the requirement of Sec. 3(s) (3) in this respect is thereby met. However, because we may be in error in holding that they are one establishment, we will also consider whether the office building itself has employees in commerce.

The Secretary contends that the effect of the 1961 amendments is to broaden coverage as to individual employees as well as, by the adoption of the "enterprise" and "establishment" concepts, to bring under coverage groups of employees all of whom are not in commerce. We see nothing in the amendments or in the legislative history that supports this contention. We therefore conclude that the question whether the building has employees who are in commerce must be decided by applying the standards that were applicable prior to the adoption of the 1961 amendments. Moreover, it should be recognized that the 1949 amendments narrowed the definition of an employee engaged in the production of goods for commerce. Prior to 1949, Sec. 3(j) of the Act (29 U.S.C.A. § 203(j)) provided that an employee was engaged in the production of goods for commerce if he was engaged in a process "necessary" to the production thereof. Since 1949, under Sec. 3(j), an employee is engaged in the production of goods for commerce only if he is engaged in a process "closely related" and "directly

essential" to the production thereof. This means that, while cases dealing with this provision as it was prior to 1949 are relevant, they should be considered in the light that the definition has been narrowed.

In asserting that the building has employees in commerce, the Secretary contends that the nature of the work carried on by the occupants of the building requires the conclusion that all of these custodial and service employees are engaged in the production of goods for commerce. Alternatively, the Secretary contends that particular work done by some of these employees places them in commerce. We next deal with this first contention.

In Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942), it was held that maintenance, service and custodial employees of loft buildings occupied by tenants carrying on the physical process of manufacturing in the buildings are engaged in the production of goods for commerce within the meaning of the Act. The Court said that (p. 525, 62 S.Ct. p. 1121) " * * * the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce'."

In 10 East 40th St. Co. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806 (1945), it was held that maintenance, custodial and service employees of an office building having a miscellany of tenants were not engaged in the production of goods for commerce. The Court reached this result in spite of the fact that, as pointed out by the dissent at pp. 586–587, 26% of the rentable area was occupied by executive offices of mining and manufacturing concerns engaged elsewhere in the production of goods for commerce and 6.5% of such area was occupied by concerns carrying on physical production of goods for commerce in the building.

In Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945), it was held that custodial and service employees of an office building principally occupied by the executive offices of a concern which owned the building and which carried on extensive production of goods for commerce elsewhere were engaged in the production of goods for commerce.

In D. A. Schulte Co. v. Gangi, 328 U.S. 108, at page 118, 66 S.Ct. 925, at page 930, 90 L.Ed. 1114 (1946), the Court, though dealing with a different problem, said:

" * * * While the Wage-Hour Act covers employees engaged in the production of goods for commerce, a maintenance employee working for a building corporation which furnishes loft space to tenants can hardly be so engaged unless an adequate proportion of the tenants of that building are so engaged. Kirschbaum [Co.] v. Walling, 316 U.S. at page 524 [62 S.Ct. 1116, 86 L.Ed. 1638]; Walling v. Jacksonville Paper Co., 317 U.S. 564, 572 [63 S.Ct. 332, 87 L.Ed. 460]."

From these cases we conclude that building employees are, by virture of the nature of the work carried on in the building, engaged in the production of goods for commerce (1) if a sufficiently large portion of the space in the building is used for the physical production of goods for commerce (Kirschbaum) or (2) if a sufficiently large portion of the space in the building is occupied by the offices of a concern which owns the building and which is engaged elsewhere in the physical production of goods for commerce (Borden Co.). But we also conclude that building employees are not engaged in the production of goods for commerce if the building is occupied by a miscellany of tenants even though a substantial portion of the space is occupied by offices of tenants which are engaged elsewhere in the production of goods for commerce (Callus).

■ In the instant case, defendant occupies about 11% of the space in its building. Defendant, in this space, is engaged in the physical production of goods for commerce, since it, among other things, prepares and sends insurance policies in interstate commerce. Darr, supra, 169 F.2d 262, 264 and Union National Bank, supra, 207 F.2d 848, 850. There may have been other space occupied by tenants engaged in the physical production of goods for commerce, e. g. a branch office of a casualty insurance company (see Union National Bank, supra), but the amount of space so used is not shown. According, since the building has a miscellany of tenants and since it is not shown what portion of the building is used by them in the physical production of goods, the building employees are engaged in the production of goods for commerce only if the presence of defendant's home office requires that result.

■ It should be recognized that, to the extent that the building is occupied by defendant's home office, we have both the physical production of goods for commerce (Kirschbaum) and executive offices of a concern which owns the building and which is engaged in the production of goods for commerce (Borden Co.). However, we conclude that the presence here of both factors does not alter the necessity that these activities occupy a substantial portion of the building. Neither Kirschbaum, nor Callus, nor Borden Co. furnishes any real guide lines as to what portion is substantial. The Secretary here relies primarily on Darr, supra, 169 F.2d 262, Baldwin v. Emierant Industrial Savings Bank, 150 F.2d 524, 161 A.L.R. 1234 (2nd Cir. 1945), cert. denied 326 U.S. 767, 66 S.Ct. 171, 90 L.Ed. 462 (1945), Roberg v. Henry Phipps Estate, 156 F.2d 958 (2nd Cir. 1946) and Union National Bank, supra, 207 F.2d 848. These cases do not support the Secretary's position that a sufficient portion of the building is here used for the production of goods for commerce. In Darr, the defendant

insurance company occupied about 76% of the space in the buildings for the production of goods for commerce. In Baldwin, the Court stated that the Administrator's standard of 20% is a reasonable minimum but went on to point out that a much larger portion was occupied for activities for the production of goods for commerce. In Roberg, the Court concluded that about 48% of the building was used for the production of goods for commerce. In Union National Bank, the Court concluded that the bank, which owned the building, occupied 38,-000 of a total of 48,427 square feet in the building, that branch offices of insurance companies occupied some of the remaining space, and that both the bank and the branch offices were engaged in the building in the physical production of goods for commerce. We conclude, therefore, that these building employees are not engaged in the production of goods for commerce because of the nature of the work carried on by the occupants of the building.

This brings us to the Secretary's alternative contention, which is that certain building employees are engaged in commerce because of the particular work they do.

■ The switchboard operator, who provides an answering service heretofore referred to, regularly receives interstate telephone calls for tenants who have engaged her services and transmits messages to these tenants. For one casualty insurance adjuster, she regularly receives interstate telephone calls from claimants and prepares a preliminary loss notice which she transmits to the adjuster. It seems clear that she is engaged in commerce within the meaning of Sec. 3(b) of the Act. "Commerce" is therein defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." Telephone Answering Service, Inc. v. Goldberg, 290 F.2d 529 (1st Cir. 1961).

The Secretary also contends that building porters and elevator operators are engaged in commerce. The building does not have a freight elevator so that freight and express shipments are lowered into the basement during the day by a sidewalk lift operated by porters, signed for by them, and then at night these shipments are carried by porters, on the passenger elevators, to the offices of the tenants. A substantial part of these shipments have moved in interstate commerce. Moreover, the post office letter carrier and parcel post deliveryman ride the elevators to make deliveries of letters and parcels which have moved in interstate commerce. The Secretary relies on Sucrs. De A. Mayol & Co., Inc. v. Mitchell, 280 F.2d 477 (1st Cir. 1960), cert. denied 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195 (1960), McComb v. Herlihy, 161 F.2d 568 (4th Cir. 1947) and Mitchell v. Royal Baking Co., 219 F.2d 532 (5th Cir. 1955) which do hold that employees of manufacturers or distributors, who move interstate shipments of supplies from unloading areas into warehouses for storage, are engaged in commerce. We can see no distinction between these cases and the instant case, at least so far as the porters in the instant case, who actually receive and move the shipments, are concerned. This question, it should be pointed out, was not involved in Callus, supra, for there the question was whether the employees as a group were in commerce only because of the nature of the activities of the tenants and the question there was whether the employees were engaged in the production of goods for commerce under Sec. 3(j) of the Act, not whether they were engaged in commerce under Sec. 3(b) of the Act. We therefore conclude that these porters are engaged in commerce.

Since we have determined that two or more employees of the building are engaged in commerce, it is not necessary to resolve the difficult question whether the maid who cleans the home office, along with other offices, is engaged in the production of goods for commerce.

It results that all of these building employees are covered employees by virtue of the 1961 amendments to the Act.

An order will be prepared consistent with this memorandum decision.