**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,**

v.

**F. C. JERNIGAN, Appellee.**

**No. 25495.**

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1968.

Bessie Margolin, Associate Solicitor, Robert E. Nagle, Carin Ann Claus, Attys., Dept. of Labor, Washington, D. C., Charles Donahue, Sol. of Labor, Edward D. Friedman, Deputy Sol. of Labor, Beverley R. Worrell, Regional Atty., for appellant...

C. A. L. Johnstone, Jr., Mobile, Ala., for appellee; Johnstone, Adams, May, Howard & Hill, Mobile, Ala., Brooks, Garrett & Thompson, Brewton, Ala., of counsel.

Before BROWN, Chief Judge, RIVES and McENTEE,* Circuit Judges.

McENTEE, Circuit Judge.

The Secretary of Labor brought this action to enjoin violations of the Fair Labor Standards Act pertaining to minimum wage and related matters. 29 U.S.C. § 201 et seq. Defendant Jernigan conceded noncompliance but claimed exemption as a retail or service establishment [1] under § 13(a) (2) of the Act. After trial on a stipulation of facts, the district court upheld defendant's contention.

Since 1949 Jernigan has operated a restaurant on certain premises in Brewton, Alabama.[2] In addition, he has acted as an agent for the Greyhound Corporation since 1946. From 1955 to 1965 Jernigan also acted as an agent for the Western Union Telegraph Company during its off duty hours. We need not, however, concern ourselves with the details of this last relationship. See n. 6, infra. Pursuant to contract with Greyhound,[3] Jernigan sells bus tickets; gives

* Of the First Circuit, sitting by designation.

1. The Act defines a retail or service establishment as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 U.S.C. § 213(a) (2).

2. It is recognized that the operation of this restaurant gives rise to "retail sales."

3. This contract provides in part as follows:
"1. (d) * * * The title to all tickets and proceeds thereof shall be at all times in the Company, it being the intention of this agreement that the

out information as to rates and schedules; contracts for the delivery of shipments; provides a waiting room as well as space for loading and unloading, and handles baggage for Greyhound.[4]

Defendant's insurance policies with respect to the operations on the premises covered all phases of his operations together. He held but one local license to operate all these business activities. He maintained only one set of books and in his federal income tax return made no breakdown of receipts or expenses. Moreover, apart from the proceeds from the restaurant these returns included only defendant's commissions. They did not include funds received on behalf of Greyhound or Western Union. During the period from 1962 to the present Jernigan has had an average of seventeen employees. He himself spent most of his time handling Greyhound matters and did very little work in connection with the restaurant operation. Except as indicated in the margin [5] all the employees worked regularly in the restaurant operation exclusively.

■ The sole issue presented here is whether the total proceeds resulting from the Greyhound agency rather than just the commissions should be taken into account in determining the "dollar volume of sales of goods or services" of defendant's enterprises within section 13(a)(2) of the Act. If the total proceeds are considered Jernigan admittedly comes within the Act but if only the commissions are considered, the exemption ap-

Agent shall at all times be in the position of trustee of said tickets and the proceeds thereof for the Company." The contract also provided for payment to the agent of certain percentages of the monies collected by him to be deducted as commissions.

Greyhound owns and consigns to defendant for his use the ticket validating machine, ticket holders and cash drawer. In addition, Greyhound owns the bus sign outside Jernigan's premises.

4. During the years 1962–64, the following gross receipts were recorded.

|      | Restaurant   | Greyhound   | Telegraph |
|------|--------------|-------------|-----------|
| 1962 | $ 99,950.20  | $80,545.36  | $503.00   |
| 1963 | 106,675.78   | 69,748.49   | 529.00    |
| 1964 | 111,954.62   | 78,836.90   | 468.00    |

Jernigan's commissions from the Greyhound sales were:

| 1962 | $7,610.79 |
| 1963 | 8,635.25  |
| 1964 | 7,764.07  |

Jernigan's net receipts from the telegraph operation were $1,200 a year.

———◆———

5. a. Employee Strain devoted about forty per cent of her time to Greyhound and Western Union agencies until Western Union service was discontinued on November 1, 1965. Since then she has devoted about twenty-five per cent of her time to Greyhound matters.

b. Employee Wilson has spent approximately two hours per day on non-restaurant matters, but less time since November 1, 1965.

c. Employee Hogg has substituted for employee Wilson on her time off.

d. Employee Frazier relieves the cashier of the restaurant operation one night per week and gives information on Greyhound schedules.

e. Employee Nichols spends twenty to thirty per cent of his time exclusively on Greyhound work. He spends the remainder of his time on janitorial duties for all of Jernigan's facilities.

f. Employee Lundy did substantially the same work as employee Nichols prior to the latter's employment.

g. Employee Reece did the same work as employee Lundy prior to the latter's employment.

No claim has been made that employees working exclusively in the restaurant are within the Act's coverage.

plies.[6] In computing the annual sales the district court counted only the commissions from the non-retail bus operation rather than the gross receipts.

We conclude that the gross receipts rather than the commissions must be included. In the first place the term sale is defined quite capaciously in the Act. " 'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). While this broad definition is not by itself dispositive of the case, it must at least serve as a point of departure. Cf. Wirtz v. Savannah Bank & Trust Co., 5 Cir., 1966, 362 F.2d 857, 862–863 where this definition of "Sale" is construed to include such things as the rent of office space; accord, Wirtz v. First National Bank & Trust Co., 5 Cir., 1966, 365 F.2d 641 (rental of office space is a "disposition" within § 203(k).)[7] Cf. 29 C.F.R. ¶ 779.-241: "As long as the employee in any way participates in the sale of the goods he will be considered to be 'selling' the goods. * * * "

■ Furthermore, we are mindful that this Act is to be interpreted liberally with exceptions narrowly construed against those seeking to assert them. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393

(1960); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295–296, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). This is not a mere technical point. Rather, the exceptions to the policy concerning minimum wages have been narrowly drawn to fit particular needs and are not to be enlarged by judicial construction.

Quite apart from the wording and history of the statute, it is defendant's contention that his interpretation is compelled by the economic realities of the situation and any other interpretation would present an unrealistic picture of his business. In support of this proposition he cites Schmidt v. Randall, 160 F. Supp. 228 (D.Minn.1958) and Mitchell v. Carratt, 160 F.Supp, 261 (S.D.Fla.1956). It is true that examination of the gross receipts suggests that the Greyhound agency is a very large factor in defendant's economic life. See n. 4, supra. But even an examination of the net proceeds still leads to the very same conclusion.[8] Even after the Greyhound commissions are scaled down to reflect their proportionate share of overhead expenses, they play a much larger role in defendant's economic life than would be supposed by one who compared only the restaurant gross with what Jernigan considers his "gross," i. e., his commissions.[9]

Further, it must be emphasized that defendant provides a whole range of fa-

---

6. The mathematics of the case is such that it makes no difference how the telegraph agency is treated. That is, if only the Greyhound commissions are considered, the exemption applies even if the total proceeds from the telegraph agency constitute part of defendant's dollar volume. On the other hand, if the Greyhound gross receipts are considered the exemption cannot apply in any event.

7. See Senate Report No. 1487, U.S. Cong. & Adm.News, 89 Cong., 2d Sess., p. 3009 (1966): "This test * * * is intended to measure the size of an enterprise for purposes of enterprise coverage in terms of the annual gross volume in dollars * * * of the business transactions which result from activities of the enterprise, regardless of whether such transactions are 'sales' in a technical sense. * * *."

We also note the statement, id., that the gross dollar volume of sales is "meas-

ured by the price paid by the purchaser" and the statement in 29 C.F.R. ¶779.248 that the "annual gross volume of sales of an enterprise consists of its gross receipts. * * * " These statements, while more directly in point, are actually equivocal on the issue *sub judice*. Defendant concedes that price, not profit, is the measure of gross receipts. He contends, however, that in this case the gross receipts are the receipts of Greyhound for which he is merely an agent. Accordingly, his "gross receipts" would be merely the commissions.

8. Net profit of the entire Jernigan establishment:

| 1962: | $17,976.67 |
|---|---|
| 1963: | 16,578.15 |
| 1964: | 18,832.27 |

As indicated in n. 4, supra the Greyhound agency during the period in question yielded between $7,600 and $8,600 per annum.

cilities and service in connection with his transportation function. Indeed, his functions may well be within the specific terms of the Motor Carrier Act, 49 U.S. C.A. § 303(a) (10), (14), (19). In view of this the instant case is easily distinguishable from the situation where, for example, a proprietor permits a vending machine to be placed on his premises in return for a share of the proceeds. Here the defendant has much more than a mere custodial function.

Finally, as above stated, Jernigan relies on Schmidt v. Randall and Mitchell v. Carratt, supra. Insofar as these cases uphold his contention we decline to follow them. Carratt, an unreported case until after it was cited in Schmidt, merely states the conclusions arrived at without supporting discussion beyond the *ipse dixit* that "the excess of said ticket revenues over defendant's commission thereon is not revenue to defendant but to a bus company," Carratt, supra, 160 F. Supp. at 261.

Schmidt is grounded on the following factors: (1) the authority of Carratt, (2) that the phrase "[T]he gross receipts derived by establishment from such activities,"[10] suggests that less than the total amount received for the tickets is to be considered in determining gross receipts. It does not appear to us, however, that this language or the language currently in force[11] supports the court's reasoning in Schmidt. Reference to the gross receipts of the establishment does not provide an answer in this case; rather, it is the very question in issue. (3) The district court reasons that defendant is not merely including his profit since he has to pay certain expenses out of the commissions. This is strictly true but nothing follows from it. It is equally true that the restaurant proceeds over and above the price of the food must be further reduced by overhead such as rent and salaries. But if the fact that the commissions do not represent pure profit leads to the conclusion that only the commissions should be considered in determining qualification for the exemption, then the cost of food in the restaurant should also be excluded on the same basis. Yet no one suggests this conclusion for the fundamental reason that proceeds and profits are not the same thing.

Reversed.

---

9. In this respect defendant's argument that only about 7% of his employees' time (12% if Jernigan himself is included) is spent on Greyhound activities actually works against him. Precisely for this reason, scaling down his commissions to reflect overhead will not result in the sharp drop in proceeds he implies will materialize. Also, of course, there is no cost of goods factor in connection with the Greyhound profits.

10. Schmidt, supra, 160 F.Supp. at 230, quoting 29 C.F.R. ¶779.13.

11. The section is now 29 C.F.R. ¶779.344 and reads: "The 'annual dollar volume of sales' of an establishment consists of the gross receipts from all sales of the establishment during a 12 month period."