George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

E. E. FALK, Individually and as a partner in Drucker & Falk, et al., Defendants.

Civ. A. No. 12-69-NN.

United States District Court, E. D. Virginia, Newport News Division.

Jan. 16, 1970.

William H. Horkan, Thomas E. Korson, Attys., U. S. Department of Labor, Washington, D. C., Brian P. Gettings, U. S. Atty. for Eastern District of Virginia, Alexandria, Va., John A. Field, III, Asst. U. S. Atty., Norfolk, Va., for plaintiff.

Herbert Kelly, Newport News, Va., for defendants.

OPINION AND ORDER

KELLAM, District Judge.

The five individual defendants are partners engaged in the business of

"selling real estate and insurance and managing rental property." As a part of their activities, defendants manage or supervise numerous apartment projects under contracts with the owners. These contract rental payments "as received are deposited in an in and out account on behalf of the owner and expenses[1] are paid out of this account with the balance distributed immediately after receipt. Ownership remains with the owner and not the defendants and contractual arrangement is one of owner and rental agent." [2] All facts are stipulated, and no oral evidence was presented.

The management agreements between owners of the apartments and defendants refer to defendants as "Agent." Among other things, the agreement requires defendants to deposit the collected rents into a trust account, "separate from Agent's personal account," and Owner may require Agent to establish a separate trust account for the property. The agreement also conveys certain specific powers upon the Agent, namely to advertise the project, and make repairs and alterations. Owner agrees to hold and save Agent harmless and free from damages or injuries to persons or property, to carry liability insurance, and the agreement provides Agent is only liable for errors of judgment or mistake of fact or law if it constitutes willful misconduct or gross negligence.

The real issue is whether the gross rentals collected by defendants as Agents for the Owners of the various rental projects should be included in determining the "annual gross volume of sales made or business done." Plaintiff says yes, namely, that the total sum of all the rentals collected by defendants from the various rental projects for the Owners must be included in determining the annual gross volume of sales made or business done. Defendants say no, namely, that only the gross commissions which defendants receive from the Owners of the projects should be considered

in determining the annual gross volume of sales made or business done; that the rents collected from each apartment project were the property of the Owner and only passed through defendants' hands as Agents. We are only concerned in this action with the period of February 1, 1967, through January 31, 1969, since it is agreed that even under the defendants' theory of accepting the gross commissions as the measure of the gross volume of sales made or business done as the true test, defendants after January 31, 1969, come within the economic test.

Title 29 § 203(s) (1) provides:

"Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) or is a gasoline service establishment whose annual gross volume of sales is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated), and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated).

The Act was amended in 1961 and again in 1966. The principal purpose of the 1961 amendment was to incorporate into the Act the "enterprise" theory. It likewise appears that the 1966 amendment was to clarify and define rather than extend the "gross sales test" which had been included in the 1961 amend-

---

1. Expenses of the project, but not of defendant.

2. Stipulated in "Order on Final Pre-Trial Conference."

ment. This very issue is dealt with in Wirtz v. Columbian Mutual Life Insurance Company, 380 F.2d 903, 908 (6th Cir. 1967), where the Court said:

> The economic test embodied in section 3(s) (3) was changed by the Fair Labor Standards Amendments of 1966 to read "annual gross volume of sales made *or business done.*" (Emphasis added.) It is of course arguable that the purpose of the amendment was to extend coverage to enterprises which Congress had theretofore intentially excluded by use of the narrowly defined gross sales test. However, Senate Report No. 1487, 89th Cong., 2d Sess., p. 7, U.S.Code Cong. & Admin. News 1966, p. 3002, provides:
>
> > "The phrase 'business done' has been added to the definition of 'enterprise engaged in commerce or in the production of goods for commerce' to reflect more clearly the intended meaning of the economic test of business size expressed in the present act in terms of 'annual gross volume of sales.' This test, as shown by Senate Report No. 145 * * * (and now judicially confirmed by the courts in Wirtz v. Savannah Bank & Trust Company (C. A. 5, June 27, 1966) [362 F.2d 857] and Wirtz v. Columbian Mutual Life Insurance Company, 246 F.Supp. 198), [the instant case] is intended to measure the size of an enterprise for purposes of enterprise coverage in terms of the annual gross volume in dollars * * * of the business transactions which result from activities of the enterprise, regardless of whether such transactions are 'sales' in a technical sense."

Although this Report apparently goes beyond the decision herein in attributing a broad meaning to the word "sale," it is clear that the purpose of the recent amendment was not to extend coverage but rather, to clarify the provision under consideration and to "remove any possible reason for misapprehension." It follows that the District Court correctly held that ap-

pellant's investment income should be included as part of its "annual gross volume of sales."

█ In this case there can be no question defendants do not own the apartment projects, nor do they control or operate them, except as Agent for the Owners; nor is the rent collected the property of defendants. These monies are to be deposited in a special trust account, and may only be co-mingled "in one trust account maintained by Agent for all or several clients or properties managed by Agent," [Def. Ex. 1] and Owner may even require Agent to maintain a special account for said fund. More than a debtor-creditor relationship exists. The sums to be distributed from said collections are controlled by the Owner. The rentals do not belong to defendants any more than the deposits of a bank belong to it, or the proceeds of a personal injury settlement made by a lawyer on behalf of his client belong to him, or the proceeds of a loan being closed by a lawyer for his client belong to the lawyer, or the proceeds of a sale of real estate made by an agent for his customer belong to the agent. Is a lawyer who represents a large estate and who on behalf of that estate handles the sale of stocks, bonds, real estate and other assets, collects and distributes the funds, to be charged with the gross sum collected and distributed as a part of "annual gross volume of sales made or business done?" In many places the lawyer's revenue license to do business is a tax computed on gross receipts.

Would the position of defendants be any different if the collections were deposited in a bank account in the name of the Owner, and defendants were given authority to check on that account for the purpose of properly disbursing the funds? Or, would the situation be different if the funds were deposited in the name of Owner, and Owner drew a check to defendants for the commissions due defendants?

In Wirtz v. Columbian Mutual Life Insurance Co., 246 F.Supp. 198 (W.D.

Tenn. 1965), affirmed 380 F.2d 903 (6th Cir. 1967), the issue was whether investment income, including proceeds from sales or exchanges of stocks and bonds, interest, dividends, etc., should be included in gross sales. In determining that receipts from sales and exchanges of stocks and bonds should not be included, the Court said [246 F.Supp. 198, 204]:

> It appears to us, therefore, that we must choose between a literal application of the definition of a "sale" contained in Sec. 3(k) of the Act, and an interpretation of "annual gross volume of sales" contained in Sec. 3(s) (3) which would carry out the intention of Congress (1) that coverage depend upon the size of the business and (2) that receipts would be included which do not result from transactions that could be called a sale under the Sec. 3(k) definition. We conclude that the clear intention of Congress should prevail. Accordingly, we believe that receipts from these sales and exchanges of stocks and bonds should not be included. The fortuitous circumstance of the amount of sales or exchanges of stocks and bonds for reinvestment in a particular year would be little, if any, indication of the size of the business. Nor would, for example, the sale of the office building be such an indication. On the other hand, the amount of investment income, along with the amount of premium income, does indicate the size of a life insurance business.

In affirming the above decision, 380 F.2d 903 (6th Circuit 1967) at page 907, the Court of Appeals said:

> As the District Court noted, the legislative history of the Act reveals that "finance" companies, "whose income would certainly be interest," were intended to be embraced within the enterprise provisions of the 1961 amendments. Both the House and Senate Reports provide:
>
> > "This section [now 3(s) (3)] would provide minimum wage and overtime protection under the act for approximately 100,000 additional employees in such enterprises as wholesale trade, finance, insurance, real estate, transportation, communications, and public utilities, and business, accounting, and similar services."

Senate Report p. 1650; House Report No. 75, 87th Cong., 1st Sess., p. 13. And, as indicated above, it has now been judicially established that banking enterprises are covered under the Act. While not suggesting that the operation of a bank is identical with the operation of an insurance company, it is difficult to perceive why income derived from a bank's investments should be counted as gross sales, while the investment income of an insurance company recognized as a major source of underwriters' revenue, would not similarly be included.

It is noted the term "income" is used in the determination of gross sales, and not the sale price of stocks, bonds, etc. And that Court continuing on page 908, said:

> Thus it is here determined that with respect to insurance companies as in the case of banks, where the investment of money in various manners constitutes an integral and closely related aspect of the general overall business, and the income received from such investments constitutes a regular and substantial portion of such enterprises total annual income, investment income (whether denominated investment income or not) is properly includable within the enterprises "annual gross volume of sales" as that term is used in 3(s) (3).

In Schmidt v. Randall, 160 F.Supp. 228 (D.C.Minn.1958), and Mitchell v. Carratt, 160 F.Supp. 261 (S.D.Fla. 1956) the issue was whether the commissions from the sale of bus tickets retained by Schmidt, a hotel operator, and Carratt, a restaurant operator, as compensation for selling bus tickets for the bus line at their respective places of business or the total sales prices of the

tickets should be included in the gross receipts in determining the annual dollar volume of sales of goods or services. Each Court held that only the commissions received should be included, as opposed to the sales price of the tickets. To the contrary is the case of Wirtz v. Jernigan, 405 F.2d 155 (5th Cir. 1968). Defendants say that in *Jernigan* it was the owner of the "establishment" who was involved, while here defendants are not the owners of the various apartment projects.

If the Committee of Congress in preparing the amendments had intended that the sales price of all real estate sold by any real estate agent or broker or the total rental of any lease should be included in the term "annual gross volume of sales made or business done", it would have said so either directly or by example in reporting the Act to Congress for passage. It did consider the holding of the Court in Wirtz v. Columbian Mutual Life Insurance Company, 246 F.Supp. 198, referred to above, Senate Report No. 1487, U.S. Code Congressional and Administrative News, 1966, Vol. 2, page 3002, at 3008, where at page 3009, it said:

> The phrase "business done" has been added to the definition of "enterprise engaged in commerce or in the production of goods for commerce" to reflect more clearly the intended meaning of the economic test of business size expressed in the present act in terms of "annual gross volume of sales."

> \* \* \* \* \* \*

> The intent to measure the "dollar volume of sales or business" including "the gross receipts or gross business" in determining coverage of such an enterprise was expressed in the Senate report above cited at page 38. The addition of the term "business done" to the statutory language should make this intent abundantly plain for the future and remove any possible reason for misapprehension. The annual gross volume of sales

made or business done by an enterprise, within the meaning of section 3(s), will thus continue to include both the gross dollar volume of the sales (as defined in sec. 3(k) which it makes, as measured by the price paid by the purchaser for the property or services sold to him (exclusive of any excise taxes at the retail level which are separately stated), and the gross dollar volume of any other business activity in which the enterprise engages which can be similarly measured on a dollar basis. This would include, for example, such activity by an enterprise as making loans or renting or leasing property of any kind.

When it refers to "making loans or renting or leasing property of any kind" it refers to the Owner of the property renting or leasing the same as was the case in Wirtz v. Savannah Bank and Trust Company, 362 F.2d 857, and Wirtz v. Columbian Mutual, etc., 246 F.Supp. 198 [referred to in the Senate Report] and not the rental agent. In Wirtz v. Columbian Mutual, supra, the insurance company as owner of the building had a contract with an agent for management of the building [see 380 F.2d 903 at 905], leasing building spaces to tenants, collecting and transmitting the rents, etc. There the agent, subject to appellants approval hired the maintenance and custodial personnel of the building. There, contrary to the position here, the Secretary of Labor contended the maintenance and custodial personnel were employees of Columbian Mutual, rather than the rental agent.

Since the volume of business is one of the tests of whether a business is within the Act, it is difficult to believe Congress intended the measure of the size of the business to be the sum which passed through the business. That is, the total deposits of a bank, as opposed to its gross income; the total receipts of a brokerage firm from sale of properties of others on commission as opposed to the gross sum from sale of its services, its commissions; the total amount of a loan closed as opposed to the lawyer's

gross fee; the sales price of real estate sold by a real estate agent or broker as opposed to his commissions. A real estate firm might act as agent for the sale of one parcel of land at a sales price of one million dollars in a year, with few other sales. Under the government's view, such a business, if the other requirements of the Act were met, would come within the Act.

The "gross volume of sales made or business done" is what is sold by the Agent, his services. He cannot sell for himself what is not his. What he sells of the owners he sells for the owners as the owners' agent. This then is the owners' sale. The owner corporation can only act through agents. What would be different if one of the officers of the corporation—who as an officer is still an agent of the corporation—conducted the same activities as those conducted by defendants for the corporate owner.

While Shultz v. Arnheim and Neely (W.D. Pa. 1969), yet unreported, holds to the contrary, a reading of the background of the legislation and the briefs of counsel filed herein convinces me the better reasoning supports defendants.

▆ Too, I am not convinced that defendants' activities constitute an enterprise within the meaning of the Act. Defendants are agents. Their activities in selling insurance, selling or renting of real estate, etc., are as agents for others. They operate one business. While they manage the various apartments, they do so as agents of the owners, and from their one establishment. The various apartment projects do not constitute separate establishments of defendants. They are but one part of the business of defendants one establishment. In keeping with Wirtz v. Columbian Mutual, supra, the managers, service employees, repairmen, etc., are employees of the project and not employees of the defendants.

Again referring to the legislative history, Senate Report No. 1487, U.S. Code Congressional and Administrative News 1966, Vol. 2, page 3002, at 3029, we find this language:

> In any case where a person other than the owner of an apartment building is engaged by the owner to perform management services in connection with the operation of the building, those individuals employed at and resident in the building as managers, caretakers, janitors, or in a similar capacity shall be considered for the purposes of this subsection employees of the building owner.

Further, one of the tests as to whether an enterprise exists by reason of defendants' activities at the various apartments is explained in the legislative history dealing with the 1961 amendment, Senate Report No. 145, U.S. Code Congressional and Administrative News 1961, Vol. 2, page 1620, at page 1661, where it is said:

> There may be a number of different types of arrangements established in such cases. The key in each case may be found in the answer to the question, "Who receives the profits, suffers the losses, sets the wages and working conditions of employees, or otherwise manages the business in those respects which are the common attributes of an independent businessman operating a business for profit?"

While the Court need not reach the issue of whether an injunction should be granted, it is appropriate to say that counsel for plaintiff in oral argument stated this was not a case where an injunction against future violations was necessary or appropriate.

For the reasons hereinabove set out, the relief sought is denied and the suit dismissed.