## IVEY et al. v. FOREMOST DAIRIES, Inc.
### Civ. No. 3290.

United States District Court
W. D. Louisiana, Shreveport Division.

Aug. 25, 1952.

794

I. Walter Fisher, Erle Phillips, Atlanta, Ga., L. L. Lockard, Booth, Lockard & Jack, Shreveport, La., for defendant.

DAWKINS, Chief Judge.

This complaint was filed in the names of some nineteen petitioners, to wit: Jesse Ivey, Billie M. Wise, Howard J. Young, Jr., Archie H. Pollard, Lee G. Nunley, J. V. Woodall, Joseph Patero, Harvey Dunn, Luther McCollister, Paul Ivey, Loyd A. Williamson, Johnnie A. Rhodes, Riley B. Alford, P. M. Hudson, Ed Summerfield, James Cook, William People, Bonnie Humphrey, and B. F. Mitchell, all citizens of Louisiana, against Foremost Dairies, Inc., alleged to be a corporation organized under the laws of New York, with its principal and only place of business in the City of Shreveport, Louisiana. The claims are for alleged overtime under the federal Fair Labor Standards Act (called Labor Act), 29 U.S.C.A. § 201 et seq., as employees over a period of two years immediately preceding the filing of the suit on March 5, 1951.

In substance, the cause of the action is as follows:

That defendant, during the period alleged, "was engaged in commerce and interstate commerce * * * in the wholesale and retail business of manufacturing and selling various products such as ice cream, cheese, cream, butter, strawberries, orange juice, popsickles, cottage cheese, oleomargarine, eskimo pies, milk, whey, buttermilk, chocolate milk, fudge pies, the mixing of these and other products and ingredients to make and sell other products, as defined by Section 3 of the Act. Defendant purchased these products or ingredients thereof from out of the State of Louisiana, as part of their business, made and sold these and other products in Louisiana, for sale in other States and sold in interstate commerce."

"All complainants were engaged in employment for the defendant in the production of goods for commerce or working on goods for commerce directly or were employed in a closely related process or occupation essential to the production of goods

—◆—

Frederick J. Stewart, Shreveport, La., for plaintiffs.

for commerce, as defined by the Act, U.S. C.A. Title 29, Section 203(j)."

There is listed for each plaintiff the number of hours overtime claimed, the number of weeks and the rate of pay, to which is added the same amount as liquidated damages. They all concede they were paid the agreed wage for the full time worked, but are demanding extra pay for overtime in excess of forty hours per week. The total amount claimed for overtime is the sum of $11,025.91, to which is added a like amount of damages, making a total of $22,051.82, plus $7,000 attorney's fees, a grand total of $29,051.82.

In its answer, defendant denied generally most of the allegations of the complaint, but admitted "during the period covered by this complaint, it did import shipments from outside the State including condensed milk, cream and other products", and that some thirteen of the plaintiffs "did load same onto defendant's trucks for delivery of same to defendant's plant, and said complainants did exercise judgment and discretion in loading said trucks so that the trucks could be safely operated", and that the Labor Act did not apply to this group for the reason they were exempt and subject to the jurisdiction of the Interstate Commerce Act (Sec. 204 of the Motor Carrier Act of 1935 [49 U.S.C.A. § 304]); and further, that some of these thirteen, as well as others, were exempt as having performed only services connected with the "first processing" operation, which are likewise excluded by the terms of the Labor Act itself.

Defendant further answered as follows:

"Further answering, defendant shows that during the period covered by the complaints, it did ship ice cream and ice cream novelties outside the State of Louisiana; that the sales in interstate commerce were not regular and recurring sales; that complainants work involving the production of goods for interstate commerce, within the meaning of the Fair Labor Standards Act was irregular and constituted less than 1% of the total time worked, such sales being set forth in detail on Exhibit A annexed hereto and made a part hereof; under these circumstances the deminimis doctrine is applicable and bars coverage under the Fair Labor Standards Act. * * *

"That during all the period of time covered by this complaint, defendant shows that all complainants worked under a formal written contract, entered into between the defendant and the union, representing complainants and all of defendant's employees; that the negotiations for the contract were conducted in protracted sessions and complainants were fully represented and complainants did vote for and accept the said contract and they have been more than paid the amounts stipulated in the said contract; that it was at the insistence of the union that a fifty-four hour week was provided for; that the application of the Wage and Hour Law to the creamery field, as engaged in by defendant, is difficult, vague and uncertain; that there is a scarcity of jurisprudence, and defendant honestly thought, and had confirmation and assurances from the union, that its decision was correct in that the Wage and Hour Law did not apply to defendant's operation as conducted by it during the period in question."

On November 2, 1951, the following complainants were dismissed from the case at their request, to wit: P. M. Hudson, J. V. Woodall, Howard J. Young, Jr., Willie Peoples, James Cook, E. D. Summerfield, Bonnie Humphrey, J. A. Patero and Johnny A. Rhodes.

The nature of the case is such that there has been much confusion in the pleadings, the trial proceedings and oral argument, which has continued into the briefs, with more or less haphazard discussions of the evidence dealing with each complainant, misspelling of names, interspersing of law with the facts, without orderly arrangement, and long quotations from decisions, running into seventy-five pages, legal cap, for the plaintiffs and about fifty-five pages for the defendant. This manner of presenting the case has added unduly a great deal of extra labor on the part of the court, which could have been minimized by first classi-

fying the claimants with respect to their duties as employees of plaintiff, briefly reciting counsel's contentions as to the facts (as to which there is not a great deal of dispute), giving reference to the pages of the record and providing the brief with an index which would permit the ready location of matters dealing with the individual claimants. This could have been followed by a citation and discussion of the law as to each class, including the cases, without such extensive quotations, mainly by plaintiffs' counsel, together with an index of that law. Such a course would have saved much time and the court much labor in searching through briefs and the record, the latter having only an index of the names of the witnesses, whether for the plaintiffs or the defendant, and a list of the exhibits.

After much effort, the court is able to state the contentions as follows:

It is claimed that all of the complainants, during the two years, worked the entire one hundred four weeks preceding the filing of the suit and are all entitled to the overtime. On the other hand, defendant asserts that B. F. Mitchell, Riley B. Alford, Harvey Dunn, Luther McCollister, Jesse Ivey, Paul Ivey, Billy M. Wise, Archie H. Pollard, Lee G. Nunley, and Loyd A. Williamson fall under the jurisdiction of the Interstate Commerce Commission by virtue of Act 204 of the Motor Carrier Act of 1935, which excludes them from the Labor Act, and that Riley B. Alford and Billy M. Wise were engaged in duties connected only with the "first processing" of the defendant's products, which also excluded them from the Labor Act. In the alternative, defendant pleads good faith to relieve it from the claims for liquidated damages.

As to those alleged to fall within the scope of the Interstate Commerce Commission's authority, defendant contends that each and all performed work in either unloading material and supplies or loading goods produced by defendant for shipment in interstate commerce, and in the case of Ennis Barrett, the servicing of trucks used to transport said goods; and, as to the two in the second category above of first processing, Alford "filled milk orders and placed milk on conveyers for loading out

on the trucks", and that Billy M. Wise was a "milk bottle washer". Ennis D. Barrett intervened on August 3, 1951.

These claims will be taken up in the order named above.

### B. F. Mitchell

While Mitchell did not testify at the trial, by agreement, one of the other employees, Loyd A. Williamson, was allowed to give the facts as to the nature of his work, which were to the effect that Mitchell worked in the ice cream department as did Williamson, and was described as "clean-up man, cleaning up freezers, pipes, vats, floors. He did painting of vats and walls".

### Riley B. Alford

Alford worked "in the milk and ice cream vault at the plant * * * I clean up the milk vault every morning, loading out milk trucks during the day, and in the evening when I wasn't busy, I loaded ice cream trucks * * *. I done it every day during the week". This included trucks of Bill Green who made deliveries across state lines in Arkansas and Texas.

### Harvey Dunn

Dunn's duties, as he described them, were: "when I first started * * * I was working in the hardening room, ice cream vault. My duties then were to stack ice cream after they had been filled, stack them in the ice cream vault, novelties and ice cream bulk". After being there about a year, he "got out in the ice cream room for a while"; also did "unloading at the plant * * * sometimes once a week and then they wouldn't come, and sometimes somebody else did it. I have unloaded novelty bags and sticks and containers—pint and quart containers * * * milk caps". He also helped unload "milk, condensed, cream from the boxcars into the truck". He was shown by the driver how to stack the cans in the truck and not to put a flat bottomed can on top of a round topped can. He sometimes rode on the truck and at others, in his car. He went down to the depot with the trucks about six times during the period in question, but his main job was in the ice cream field.

## Luther McCollister

McCollister "was in the ice cream department making pints and first one thing and another that come handy". He also "unloaded at the plant and I went down to the depot with the other boys to get stuff". He also unloaded "in the winter time it would average around once a week", principally condensed milk and cream. He likewise made trips to the railroad siding about once a week during the summer months. Some times he would skip two or three weeks. Never drove the truck. He would ride in his own car, or that of some other boys, to the depot. Paul Ivey showed him how to stack the cans in the trucks as they were loaded at the depot. Going to the depot was usually in the winter months. He kept no record as to when it was done. He had been going down to the railroad siding and unloading freight from the cars for several years and knew how to do it.

## Jesse Ivey

"Most of the time I operated a bottling machine, but a lot of times when I got there in the morning I did different things around the plant, like unloading trucks". But his regular duties were operating the bottling machine. The products handled in the bottles were "orangeade, orange juice, buttermilk, sweet milk, homogenized milk, light cream, whipping cream, chocolate milk, and during the Thanksgiving season and around Christmas we bottled eggnog". His machine filled the bottles of all kinds.

## Paul Ivey

His duties were "making mix and when I got through making mix I would help make novelties or sandwiches or pints, wherever they needed a man, I filled in". He also helped unload at the plant about once a week and about every two weeks in the summer, and "then I unloaded cream and condensed from the depot down there. I would drive most of the time".

## Billy M. Wise

Wise did not testify but the answer admits he and others "filled milk orders and worked as bottle washers * * *".

## Archie Pollard

Pollard operated the "ice cream freezers, made sandwiches, wrapped bricks and Dixie Cups, popsickles".

## Lee G. Nunley

Nunley was a "freezer man in the ice cream department * * * in the morning I would go down and get the freezers ready and I would get the ice cream to go in and I froze ice cream most of the time and then I worked on novelties, like popsickles; when I was through with the freezer, I done most anything in the ice cream department that was to be done". In the cooler weather "I would go to the depot and get cream and condensed".

## Loyd A. Williamson

Williamson's job was "general helper in the ice cream department, handling all products"; also "unloading transport trucks, unloading condensed milk, cream * * *".

## Conclusion

It thus appears that none of the claimants were confined to a particular type of work exclusively, such as could be classed as first processing, but all discharged varied duties dealing with the finished products which did not fall in that category. As one witness expressed it, most of them did "whatever came to hand". The very nature of the business was such that this could be expected. Defendant, having admitted it was engaged in the production of goods for commerce, and at least to a small degree, during a part of this time, in transporting those goods in interstate commerce, plus the undisputed fact that it has produced the work record showing the number of weeks and hours which each claimant worked, created a situation where it would seem the burden was upon it to prove any one of the employees was exempt or excluded from the benefits of the Labor Act. This it was unable to do because the defendant, the labor union, and the employees all believed and understood that they were not covered by the Act, and made the contract accordingly, including the working at the regular rates for fifty-four hours a week without overtime. As a consequence, no detailed rec-

798

ords were kept from which a distinction can be made. After investigation by Labor Department agents, this suit was instituted, but almost half of the claimants withdrew their demands.

Neither do I think that the unloading from freight cars of supplies and materials for and transported to defendant's plant, as was done here, for its own use in the operation of its business, subjects such employees to the exclusive jurisdiction of the Interstate Commerce Commission. If this were not so, then the employees of any wholesale merchant or manufacturer engaged in interstate trade, who received and unloaded merchandise shipped to it in interstate commerce or shipped out as such, would automatically fall under the authority of that Commission and could not claim the benefits of the Labor Act. A small amount of sales were made in Arkansas, at least a part of the time, without the knowledge and contrary to the purpose of defendant, but I do not think these were sufficient to bring those who assisted in loading the trucks under the Motor Carrier Act.

I am of the view that the plaintiffs should recover at the rate of one-half their regular wage for the number of hours in excess of forty, which they worked each week during the two years immediately preceding the filing of their demands; but I believe they should not be paid any liquidated damages for the reason that every one, employees, their labor union and employer honestly and in good faith believed that they were not covered by the statute in question.

In preparing the decree, the recovery should be according to the payroll records offered as exhibits as to each of the present claimants, which show the number of hours worked weekly in excess of forty.

The Act, Section 216(b), Tit. 29, U.S.C.A., makes it mandatory to allow a reasonable attorney's fee, notwithstanding, in this case, the copy of the contract of employment attached to the complaint obligates the successful petitioners to pay the attorney one-third of their recoveries. The court is of the view that the nature of the case, the recovery and the labor involved, that a fee of $2,000 for services performed other than in Appellate Courts, would be just and reasonable.