Raul C. **MONTALVO** et al., Plaintiffs-
Appellees,

v.

**TOWER LIFE BUILDING** and Tower
Life Insurance Company, Defendants-
Appellants.

No. 27501.

United States Court of Appeals,
Fifth Circuit.

April 21, 1970.

Rehearing Denied May 15, 1970.

L. H. Silberman, Sol. of Labor, U. S. Dept. of Labor, Bobbye O. Spears, Atty., Dept. of Labor, Washington, D. C., amicus curiae.

Arthur Gochman, John J. Felthaus, Jr., Victor A. Speert, San Antonio, Tex., for plaintiffs-appellees.

Before RIVES, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge.

More than two dozen maids and janitors employed in an office building seek habitation within the "enterprise" coverage erected by the 1961 Amendments to the Fair Labor Standards Act of 1938. The court below found the blueprint of coverage adequate to encompass these plaintiffs, and we agree with the lower court's reading of the statutory specifications.

The defendants in this action are the Tower Life Insurance Company (hereinafter referred to as the Company) and the Tower Life Building (hereinafter referred to as the Building). The Building, a general office building in San Antonio, Texas, is owned by the Company, a corporation writing policies of life, health, and accident insurance in the state of Texas. The offices of the Company are located in the Building, occupying approximately five percent of the available office space. The remaining office space is leased to a miscellany of tenants.

The Building is operated as a division of the Company. The records and accounts of the Building are maintained separately from those of the Company's insurance operations, although they are maintained by Company personnel in the Company's offices. In addition, the Company pays rent and expenses to the Building in the same manner as other tenants of the Building. The Manager of the Building is appointed by the Board of Directors of the Company, to whom he reports periodically. The Company has delegated to him the authority to execute leases for office space in the Building, to remodel and otherwise main-

Chester H. Johnson, George W. Krog, San Antonio, Tex., for defendants-appellants.

tain the Building, and to hire and fire Building employees.

During the periods for which the plaintiffs seek recovery—periods during the years 1965, 1966, and 1967—the plaintiffs worked as maids, janitors, and maintenance employees in the Building. They worked under the direction and control of the Building Manager, and they were paid with Tower Life Building checks. In the course of their employment they furnished custodial and maintenance services to the offices of the Company and to the other offices in the Building.

The history of the present litigation began in March of 1967, when the Wage and Hour Division of the Department of Labor instituted an investigation of the Tower Life Building. As a result of this investigation, the Division concluded that the Building employees had been covered under the Fair Labor Standards Act prior to the 1966 Amendments (which became effective on February 1, 1967). Accordingly, in August of 1967 the defendants were advised by letter that unless specified payments for unpaid minimum wages and overtime compensation were made by September 9, 1967, the employees involved would be advised of their rights under the Act. Because the payments were not made, letters were sent to all employees of the Building in October of 1967.

Apparently as a result of these letters, four lawsuits—involving a total of twenty-five plaintiffs—were instituted in the district court. These actions were brought under section 16(b) of the Act, 29 U.S.C.A. § 216(b), to recover unpaid minimum wages and overtime compensation, together with liquidated damages and attorneys' fees. The actions were consolidated and submitted for decision on the basis of interrogatories, depositions, summaries of testimony, exhibits, and briefs.

On the basis of the record thus compiled, the district court concluded that the plaintiffs were entitled to recover under the relevant provisions of the Act.[1] Accordingly, judgment was entered awarding the twenty-five plaintiffs recoveries in varying amounts totaling $29,711.35, and attorneys' fees were awarded in a sum equal to fifteen percent of the amounts recovered by the plaintiffs. The court declined, however, to award liquidated damages.[2]

1. The court filed the following Findings of Fact and Conclusions of Law:

"I find that the Defendants Tower Life Building and Tower Life Insurance Company were a single establishment enterprise on the dates in question and that such enterprise had two or more employees engaged in commerce or in the production of goods for commerce and had annual gross volume of sales of not less than $1,000,000.

"I find that the Plaintiffs employed as maids and janitors by the Tower Life Building were covered by the 1961 Amendments to the Fair Labor Standards Act of 1938.

"The Court is satisfied that the Act or omission giving rise to this action was in good faith and that the Defendants had reasonable grounds for believing that its act or omission was not a violation of the Fair Labor Standards Act of 1938 as amended and therefore finds that no liquidated damages should be awarded Plaintiffs.

"I find that the Statute of Limitations was tolled by the filing of the original complaint on November 7, 1967.

"I find that the attorneys are entitled to maintain this suit on behalf of the Plaintiffs.

"I conclude that the Plaintiffs are entitled to recover such sums as they may be able to establish as owing to them as unpaid minimum wages and overtime payments, if any, due, pursuant to the Fair Labor Standards Act of 1938 as amended and in force at the relevant times.

"I conclude that the Plaintiffs are not entitled to recover liquidated damages against the Defendants."

2. The court ruled that the plaintiffs were not entitled to liquidated damages because the defendants acted in good faith and had reasonable grounds for believing that the plaintiffs were not covered under the Act. See footnote 1 *supra*. In declining to award liquidated damages for these

Defendants appeal from this adverse judgment,[3] asserting (1) that the plaintiffs were not covered by the provisions of the Act upon which they rely, (2) that one of the four actions consolidated in this case was barred by limitations, and (3) that the trial court committed error in its award of attorneys' fees. Defendants' contentions on appeal are contested both by the plaintiffs and by the Secretary of Labor, who has submitted a brief to this court as *amicus curiae*. Because we conclude that each of the contested issues was correctly resolved against the defendants, we affirm the judgment of the district court.

## I.

The initial issue presented by this case is the question of coverage.[4] Plaintiffs ground their contentions regarding coverage in the "enterprise" coverage concept, which came into the law by way of the 1961 Amendments to the Fair Labor Standards Act. Prior to 1961 coverage under the Act was determined exclusively on an employee-by-employee basis. The Act's coverage extended "only to those individual employees who [could] be proved to be personally engaged in interstate commerce or in the production of goods for interstate commerce." Senate Report No. 145, 87th Cong., 1st Sess.

(1961), 2 U.S.Code Cong. & Admin. News 1620, 1626 (1961). Although the employee-by-employee concept of coverage was retained in 1961, a new type of coverage was added. Under this new type of coverage, known as "enterprise" coverage, if a particular unit of employment falls within the ambit of the Act, *all* of the employees in that employment unit are covered. The Congressional purpose underlying this type of coverage was "to eliminate fragmentation of coverage in the establishments of [certain] large enterprises and prevent continuance of a situation in which some of the employees in such an establishment [had] the protection of the act while others who [worked] side by side with them [did] not." *Id.* at 1650.

The Act was amended in 1966 to further extend the scope of coverage, but the 1966 Amendments are not involved in the present case. Plaintiffs seek to recover as employees who were within the Act's coverage prior to the passage of the 1966 Amendments. Consequently, in deciding this case we must look to the statute as it existed after the 1961 Amendments but before the 1966 Amendments.

As amended in 1961, section 3(s) of the Act, 29 U.S.C.A. § 203(s),[5] provided

reasons, the court apparently relied on the provisions of § 11 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 260, which provides:

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

3. The plaintiffs have not appealed from that part of the judgment which denied them liquidated damages.

4. It should be noted that at least three previous cases have involved facts substantially similar to the facts of this case. In each case it was held that the defendant employer came within the "enterprise" coverage of the Act. Wirtz v. Columbian Mutual Life Ins. Co., 6 Cir. 1967, 380 F.2d 903, aff'g W.D.Tenn.1965, 246 F. Supp. 198; Wirtz v. First National Bank and Trust Co., 10 Cir. 1966, 365 F.2d 641, rev'g W.D.Okl.1965, 239 F.Supp. 613; Wirtz v. Savannah Bank & Trust Co., 5 Cir. 1966, 362 F.2d 857, rev'g S.D. Ga.1964, 247 F.Supp. 547.

5. Section 3(s) provided:
" 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:
(1) any such enterprise which has one or more retail or service establish-

several alternative definitions of "enterprise engaged in commerce or in the production of goods for commerce," i. e., an employment unit to which "enterprise" coverage was extended. The definition upon which plaintiffs rely in the present case was found in section 3(s) (3):

"*any establishment* of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, *which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000.*" (Emphasis added.)

It is readily apparent that the plaintiffs, to establish coverage under section 3(s) (3), are obliged to show that they were employed by an *establishment* which had "employees engaged in commerce or in the production of goods for commerce" and that "the annual gross volume of sales" of the *enterprise* was not less

---

ments if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated and if such enterprise purchases or receives goods for resale that move or have moved across State lines (not in deliveries from the reselling establishment) which amount in total annual volume to $250,000 more;

(2) any such enterprise which is engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier if the annual gross volume of sales of such enterprise is not less than $1,000,000, exclusive of excise taxes at the retail level which are separately stated;

(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the reproduction of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000;

(4) any such enterprise which is engaged in the business of construction or reconstruction, or both, if the annual gross volume from the business of such enterprise is not less than $350,000;

(5) any gasoline service establishment if the annual gross volume of sales of such establishment is not less than $250,000, exclusive of excise taxes at the retail level which are separately stated: *Provided*, That an establishment shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce, or a part of an enterprise engaged in commerce or in the production of goods for commerce, and the sales of such establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection, if the only employees of such establishment are the

owner thereof or persons standing in the relationship of parent, spouse, or child of such owner."

The term "enterprise" was defined in § 3(r), 29 U.S.C.A. § 203(r), as follows: " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided*, That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement, (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments."

For discussion of the definition of "enterprise" in factual situations similar to that of the instant case, see Wirtz v. Savannah Bank & Trust Co., 5 Cir. 1966, 362 F.2d 857, 859–861; Wirtz v. Columbian Mutual Life Ins. Co., W.D.Tenn. 1965, 246 F.Supp. 198, 201–203, aff'd, 6 Cir. 1967, 380 F.2d 903, 905–907.

than one million dollars. They have attempted to meet this burden by proffering what is essentially a four-part argument. First, they contend that the Company's insurance activities and building operations, taken together, constituted an "enterprise" within the meaning of the Act. Second, they maintain that the "annual gross volume of sales" of this enterprise during the years in question was not less than one million dollars. Third, they assert that the Company had insurance office employees "engaged in commerce or in the production of goods for commerce." Fourth, they argue that the building employees were in the same "establishment" as the insurance office employees because the Company's insurance activities and its building operations took place within a single "establishment."

Defendants do not take issue with the plaintiffs' contention that the Company's insurance activities and its building operations together constituted an "enterprise." Defendants do, however, contest each of the three remaining contentions. On each of these contentions the trial court found in favor of the plaintiffs. For the reasons hereinafter given, we conclude that the trial court's findings were correct.

### A.

We turn first to the statutory requirement that the "annual gross volume of sales" of the enterprise be at least one million dollars. Although it is undisputed that the annual gross receipts of defendants' enterprise during the years in question—income from the receipt of insurance premiums, from investments, and from rentals of office space—were in excess of one million dollars, defendants argue that two portions of their premium income should not be included in the computation of their gross volume of "sales." If these portions are excluded, the resulting figure falls below the coverage level.

■ We note at the outset that defendants' arguments in this regard are so unique that defendants have been unable to cite a single Fair Labor Standards Act case in their support. In addition, we consider it important to note that defendants do not take the position that premium payments received by an insurance company can never be included in the computation of "gross volume of sales" [6]; they merely argue that two specific *portions* of their premium income should be excluded.

■ First, defendants contend that "renewal" premiums should not be considered "sales" because

"a life or health and accident insurance policy is a single contract subject to a single sale which takes place at the time the first premium is paid and the policy issued. Thereafter, renewal premiums do not constitute a new contract of insurance or a new sale but merely extend the term of the original contract already sold." [7]

---

6. In other words, defendants impliedly concede the general proposition that an insurance company's receipt of a premium payment evidences a "sale" within the meaning of the Act. We are thus spared the task of resorting to a statutory exegesis to establish this obvious proposition.

7. We are certain that defendants would not be willing to remain with this argument to its logical conclusion. If so, every holder of a life insurance contract would be gratified to learn that after his initial premium has been paid he has full rights to the policy sold and that upon his death the policy proceeds will be paid to his beneficiary even though no subsequent premiums have been paid. Such a concept, of course, is absurd. It is beyond contravention that if an annual premium is not paid there is no insurance in force. The annual premium pays for another year, and the company's sale is a sale of the coverage for the ensuing year. Without the payment of the annual premium the insured is bereft of insurance coverage.

Approaching defendants' argument from another direction, it seems obvious that if the only "sale" that occurs in the context of an insurance contract is the receipt of the initial premium, then the dollar amount of that sale should be measured not by the amount of the initial

This argument is totally devoid of merit. It involves a hypertechnical approach to the buying and selling of insurance protection which is totally unwarranted by economic reality. When a purchaser of insurance protection pays a premium to his insurer, he is not merely paying for the piece of paper on which the insurance contract is printed. Instead, he is purchasing insurance protection for a specified period of time. Obviously, then, the commodity that the insurer is selling is insurance protection for the period specified. The insurer's receipt of a *renewal* premium evidences a sale of insurance protection for a specified period in exactly the same manner as the insurer's receipt of the *initial* premium. We therefore reject defendants' argument that renewal premiums should be excluded and only "first year" premiums included in the computation of defendants' gross volume of sales.

Second, defendants contend that only part of the "first year" premiums should be included; the "major portion of the first year premiums" which is allocated to the selling agent as his commission should be excluded because under Texas law "a life insurance company has no interest in first year policy premiums to the extent that such premiums are the property of the selling agent." We need not delve into the question whether this may be a correct statement of Texas law for some purposes, for it is well established under the Fair Labor Standards Act that the seller's *disposition* of the money paid by a purchaser cannot reduce the gross amount of the sale. On the contrary, the gross amount of a sale is to be "measured by *the price paid by the purchaser* for the property or services sold to him." Senate Report No. 1487, 89th Cong., 2d Sess. (1966), 2 U.S.Code Cong. & Admin. News 3002, 3009 (1966) (emphasis add-

ed). *Cf.* Wirtz v. Jernigan, 5 Cir. 1968, 405 F.2d 155. The price paid by the purchaser for insurance protection is the total amount of the premium. There is no more justification for reducing this amount by excluding the selling agent's commission than there is for reducing the amount of a merchant's gross sales by excluding the wages paid to his sales clerks.

We are unpersuaded that either of the defendants' novel approaches to the computation of "gross volume of sales" can properly be utilized. This being true, the district court was correct in finding that the defendants' enterprise "had annual gross volume of sales of not less than $1,000,000."

### B.

We next turn our attention to the statutory requirement that the employing establishment have "employees"— i. e., two or more employees—"engaged in commerce or in the production of goods for commerce." The plaintiffs and the Secretary take the position that in this case there were employees in the Company's insurance offices who were engaged in commerce. Defendants contend, however, that the evidence is insufficient to establish that any particular employees were regularly and substantially engaged in commerce. Agreeing with the court below, we think the record fully supports the position taken by the plaintiffs and the Secretary.

Although the Company is licensed to sell insurance only in Texas, the evidence in the record shows that a number of its policyholders have moved to other states. During the period from 1965 to 1967 approximately six percent of the Company's policies were held by persons living outside the state of Texas. Many of these nonresidents mailed premiums to the Company at regular intervals—

premium, but by the cumulative amount of the premium payments reasonably anticipated in the future.

We need not belabor our point by additional observations. Suffice it to say that defendants' "one-shot" view of the

"sale" of insurance protection is totally divorced from reality. Insurance contracts contemplate annualization and divisibility rather than collectivization and indivisibility.

either monthly, quarterly, semiannually, or annually, depending on the terms of their policies. These payments were received by the Company's mail clerk. The mail clerk would deliver the payments to the cashier, who would then deposit them in a local bank.

The record also indicates that approximately one percent of all claims filed during this period were submitted by nonresidents of Texas. These claims were received by the mail clerk and were processed by the claims manager. Each time a claim was approved, a check was prepared and mailed to the out-of-state policyholder.

■ It is clear from these facts that some of the Company's employees—those receiving premium payments and claims submitted by nonresidents and those sending checks to nonresidents—were engaged "in commerce" within the meaning of the Act. The definition of "commerce" found in section 3(b) of the Act, 29 U.S.C.A. § 203(b), specifically includes "transmission [and] communication among the several States or between any State and any place outside thereof." In keeping with this definition, courts have held that employees who regularly send or receive interstate communications are engaged in commerce.

For example, in Wirtz v. Wardlaw, 4 Cir. 1964, 339 F.2d 785, the Fourth Circuit held that an insurance salesman's employees who prepared and mailed newspaper clippings, monthly newsletters, and business cards imprinted with birthday greetings, some of which were sent to out-of-state potential customers, were engaged in commerce within the meaning of the Act. In Beneficial Finance Co. v. Wirtz, 7 Cir. 1965, 346 F.2d 340, the Seventh Circuit held that employees in a Wisconsin branch office of a finance company who prepared documents and reports and regularly transmitted them to offices of the company in other states were engaged in commerce and engaged in the production of goods for commerce. In Aetna Finance Co. v. Mitchell, 1 Cir. 1957, 247 F.2d 190, the First Circuit affirmed a district court decision wherein one ground for holding the employees of a finance company office to be engaged in commerce was that "the instrumentalities of interstate commerce are used * * * to communicate with out of state borrowers and prospective borrowers." Mitchell v. Aetna Finance Co., D.R.I.1956, 144 F.Supp. 528, 532. See also Wirtz v. First State Abstract and Insurance Co., 8 Cir. 1966, 362 F.2d 83, 87; Durkin v. Joyce Agency, Inc., N.D. Ill.1953, 110 F.Supp. 918, 923, aff'd per curiam sub nom. Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740.

■ Moreover, contrary to defendants' contention, it is immaterial that these employees may have spent only a small portion of their time in performing activities with respect to the Company's out-of-state policyholders. The courts have repeatedly held that an employee may be engaged in commerce or in the production of goods for commerce within the meaning of the Act even though the time he devotes to the interstate activity is small in amount. See, e. g., Wirtz v. Durham Sandwich Co., 4 Cir. 1966, 367 F.2d 810, 812; Mitchell v. Independent Ice & Cold Storage Co., 5 Cir. 1961, 294 F.2d 186, 190, cert. denied, Independent Ice & Cold Storage Co. v. Goldberg, 368 U.S. 952, 82 S.Ct. 394, 7 L.Ed.2d 386; Mitchell v. Jaffe, 5 Cir. 1958, 261 F.2d 883, 887; Mitchell v. Royal Baking Co., 5 Cir. 1955, 219 F.2d 532, 534; McComb v. W. E. Wright Co., 6 Cir. 1948, 168 F.2d 40, 42, cert. denied, W. E. Wright Co. v. McComb, 335 U.S. 854, 69 S.Ct. 83, 93 L.Ed. 402; Southern California Freight Lines v. McKeown, 9 Cir. 1945, 148 F.2d 890, 892, cert. denied, 326 U.S. 736, 66 S.Ct. 46, 90 L.Ed. 439; New Mexico Public Service Co. v. Engel, 10 Cir. 1944, 145 F.2d 636, 640. The language adopted by this court in Grimes v. Castleberry, 5 Cir. 1967, 381 F.2d 758, 762, is particularly apt:

"If an employee regularly and continuously performs duties related to interstate commerce, then he is sub-

stantially engaged in commerce within the meaning of the Act. The fact that such duties are only a slight or small percentage of the total duties performed by the employee is of no consequence. Tilburry v. Rogers, 123 F.Supp. 109 (W.D.La.1954), affirmed per curiam in Tilburry v. Mitchell, 220 F.2d 757 (5th Cir. 1955)."

■ In the present case the record clearly shows that there were employees in the Company's offices who regularly and recurrently received or transmitted interstate communications. They were therefore engaged "in commerce" within the meaning of the Act. Since we have held these employees to be engaged "in commerce," we need not consider the Secretary's argument that they were also engaged "in the production of goods for commerce."

## C.

Having concluded that the enterprise here involved had insurance office employees engaged in commerce, we must next consider defendants' argument that the enterprise contained two separate "establishments," one composed of insurance office employees and another composed of building employees. Under section 3(s) (3) it is not enough that the *enterprise* have employees engaged in commerce or in the production of goods for commerce; the particular *establishment* in which the plaintiffs are employed must have employees so engaged. See Wirtz v. Columbian Mutual Life Insurance Co., W.D.Tenn.1965, 246 F. Supp. 198, 204, aff'd, 6 Cir. 1967, 380 F.2d 903. Seizing upon this aspect of the statute, defendants espouse the two-establishment argument. If we were to accept this argument, the plaintiffs would not be employed by a covered establishment, for on the record developed below there were no building employees engaged in commerce or in the production of goods for commerce.

We are not persuaded, however, that the two-establishment argument is valid. In a fact situation strikingly similar to the one now before us—involving a bank and its building rather than an insurance company and its building—this court held that the building employees and the bank employees were employed in a single establishment. In that case we stated:

"The final requirement under the enterprise provisions for imposing coverage in the instant situation is that there be 'employees engaged in commerce or in the production of goods for commerce' in 'any establishment of any such enterprise.' § 203 (s) (3). While no definition of the crucial term 'establishment' is found in the Act, the term has been interpreted in the context of other provisions of the Act prior to the 1961 Amendments to mean 'a distinct physical place of business.' A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 496, 65 S.Ct. 807, 810, 89 L.Ed. 1095; Mitchell v. Gammill, 5th Cir. 1957, 245 F.2d 207, 211. Since Congress did not indicate an intention to deviate from this definition of the term when it added the 1961 Amendments, we must conclude that the 'establishment' in the present case is the entire building, including the Bank operation. Inasmuch as the Bank admits that the employees of its banking and trust operation are engaged in commerce, this last prerequisite of coverage is satisfied." Wirtz v. Savannah, Bank & Trust Co., 5 Cir. 1966, 362 F.2d 857, 863.

This language was cited with approval by the Sixth Circuit in Wirtz v. Columbian Mutual Life Insurance Co., 6 Cir. 1967, 380 F.2d 903, 909.

Notwithstanding the existence of a single "distinct physical place of business" in this case, defendants contend that the corporation's insurance activities and its building activities should be held to constitute separate establishments because of a lack of "functional unity" between them. By advancing this argument in an attempt to bifurcate a distinct physical place of business, defendants are executing a reverse twist

on the concept of "functional unity"; this concept is normally invoked to show that two or more places of business which are physically *separated* should be considered a *single* establishment. See, e. g., Mitchell v. Gammill, 5 Cir. 1957, 245 F.2d 207; Mitchell v. T. F. Taylor Fertilizer Works, Inc., 5 Cir. 1956, 233 F.2d 284; Lewis v. Brandt Furniture, Inc., W.D.La.1967, 277 F. Supp. 907, aff'd, 5 Cir. 1968, 402 F.2d 265.

■■■ In the present fact situation we consider the "functional unity" argument inappropriate.[8] When business activities of a single enterprise take place within a single distinct physical place of business, for purposes of coverage under the Fair Labor Standards Act the employer should not be allowed to escape coverage for some of the employees involved by arguing that its business activities are separated into separate "establishments" along functional lines. To hold otherwise would be to frustrate the Congressional intent underlying the adoption of "enterprise" coverage, i. e., to eliminate situations in which some employees in an establishment of a large enterprise have the protection of the Act while others do not. In the light of these considerations, we conclude that the district court was eminently correct in finding that the enterprise here involved was a "single establishment enterprise."

### D.

By way of summary, we have held (1) that the annual gross volume of sales of the enterprise was not less than one million dollars, (2) that the insurance office employees and the building employees were employed in a single estab-

lishment, and (3) that the establishment had employees engaged in commerce. Therefore, since every coverage requirement has been satisfied, we uphold the trial court's finding that the plaintiffs "were covered by the 1961 Amendments to the Fair Labor Standards Act of 1938."

### II.

We next consider the limitations arguments which defendants assert in connection with one of the four actions consolidated in this case. A full understanding of these arguments will be aided by a brief resume of the relevant proceedings in the district court.

The initial action, Montalvo et al. v. Tower Life Building and Tower Life Insurance Company, Civil Action No. 67–104–SA, was filed by the surviving heirs of a deceased employee on November 1, 1967. The second action, Moreno et al. v. Tower Life Building, Civil Action No. 67–107–SA, was filed on behalf of twenty-four plaintiffs[9] on November 7, 1967. The third action, Macias v. Tower Life Building and Tower Life Insurance Company, Civil Action No. 67–110–SA, was filed on behalf of an individual employee on November 20, 1967. The final action, Diaz v. Tower Life Building and Tower Life Insurance Company, Civil Action No. 68–79–SA, was filed on behalf of an individual employee on March 8, 1968.

Defendants filed an answer to each of these four actions, but in connection with the second action, the *Moreno* suit, defendants asserted two limitations arguments which were not applicable to the other actions. If we were to accept either of these arguments, we would be compelled to reject the district court's finding that the two-year statue of limitations[10] "was tolled by the filing of the

---

8. *But cf.* Wirtz v. Columbian Mutual Life Ins. Co., W.D.Tenn.1965, 246 F.Supp. 198, 205, aff'd, 6 Cir.1967, 380 F.2d 903.

9. As a result of procedural skirmishing in the trial court, the details of which are unimportant here, the number of plaintiffs involved in this action was eventually reduced to twenty-two.

10. The statute of limitations is found in § 6 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 255, which provides:

"Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, un-

original complaint on November 7, 1967." For the reasons hereinafter given, however, we find both arguments devoid of merit.

## A.

Defendants initially find significance in the fact that the original complaint in the *Moreno* action failed to name the Company as a party defendant, naming instead only the Building. In response to the filing of the original complaint, the Building filed an answer (through the general counsel of the Company) in which it denied that it was a legal entity capable of being sued, and it later moved to dismiss the action on this ground. The district court thereupon permitted the plaintiffs to amend their complaint by adding the Company as a party defendant, and the court allowed the amendment to relate back to the date of the filing of the original complaint.

Defendants, however, continue to assert that naming the Building as the defendant in the original complaint was an error of monumental proportions.

The Building, we are told, is neither a person, a corporation, or a partnership. Defendants consider applicable here the provision of Federal Rule 17(b) [11] that " * * * capacity to sue or be sued shall be determined by the law of the state in which the district court is held * * *." Under Texas law, defendants contend, a mere business or trade name does not have the status of a legal entity capable of being sued. Consequently, defendants conclude, the filing of a complaint against the Building could not invoke the jurisdiction of the district court and thereby toll the statute of limitations.

This argument must be rejected, for even if we assume that defendants are correct in their assessment of Texas law, their conclusion concerning the significance of Texas law in the present case is wide of the mark. In our view the problem presented by the misnomer in the original complaint was not one of capacity to be sued, but merely one of mistaken identity within the purview of Federal Rule 15(c).[12]

paid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

> (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued * * *."

11. In its entirety Fed.R.Civ.P. 17(b) provides:

> "Capacity to Sue or Be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name

for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C., §§ 754 and 959(a)."

12. Fed.R.Civ.P. 15(c) provides:

> "Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the ac-

Under the provisions of Rule 15(c) the amended complaint in the *Moreno* action must be held to relate back to the date of the filing of the original complaint (1) if the claim asserted in the amended complaint "arose out of the conduct, transaction, or occurrence" set forth in the original complaint, (2) if at the time of the filing of the original complaint the Company "received such notice of the institution of the action" that it would "not be prejudiced in maintaining [its] defense on the merits," and (3) if at the time of the filing of the original complaint the Company "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against" the Company. It is abundantly clear that each of these requirements was met in this case. First, since the amended complaint made no change in the substance of the claim asserted in the original complaint, it is undisputed that the claim asserted in the amended complaint "arose out of the conduct, transaction, or occurrence" set forth in the original complaint. Second, the Company must have received adequate notice of the institution of the suit, for the answer filed on behalf of the Building was signed by the Company's general counsel. Third, the Company knew or should have known that the plaintiffs had every intention of bringing suit against their employer—whatever the employer's proper legal name might be—and that their failure to name the Company as a party defendant resulted from "a mistake concerning the identity of the proper party."

Moreover, we must agree with the plaintiffs that "they were not derelict" in naming the Building as the defendant in the original complaint. Since the Building contracted in its own name, had its own bank account, and issued paychecks to its employees (including the plaintiffs) in its own name, it was reasonable for the plaintiffs to assume that they could name the Building as the defendant. In other words, if it was a mistake for the plaintiffs to name the Building as the party defendant, the defendants contributed to the mistake by the manner in which they organized their business activities.

In the circumstances of this case, we are compelled to conclude that the district court's order allowing the plaintiffs to amend their complaint by adding the Company as a party defendant was clearly warranted by Rule 15(c). *Cf.* Marino v. Gotham Chalkboard Mfg. Corp., S.D.N.Y.1966, 259 F.Supp. 953. Under the provisions of Rule 15(c) the amended complaint related back to the date of the filing of the original complaint, tolling the statute of limitations as of that date.

### B.

Defendants' alternative limitations argument is based on two statutory provisions. The first is a portion of section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), which provides as follows:

"Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a

tion would have been brought against him.

"The delivery or mailing of process to the United States Attorney, or his designee, or the Attorney General of the United States or an agency or officer

who would have been a proper defendant if named, satisfies the requirement of clauses (1) and (2) hereof with respect to the United States or any agency or officer thereof to be brought into the action as a defendant."

**1148**

party and such consent is filed in the court in which such action is brought. * * * "

The second is section 7 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 256, which provides as follows:

"In determining when an action is commenced for the purposes of section 255 of this title, an action commenced on or after May 14, 1947 under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant—

(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

(b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced."

In keeping with the statutory requirement of "written consent to become a party plaintiff," prior to the filing of the original complaint in the *Moreno* action each of the plaintiffs had signed a document authorizing the bringing of the suit, and a zerox copy of the list of signatures was appended to the complaint. Defendants, however, have consistently challenged this zerox copy, asserting that it was inadequate to constitute "written consent" and thereby toll the statute of limitations.

In the trial court defendants filed a motion requesting that the plaintiffs be required to produce the original of the document authorizing the suit, and the plaintiffs did produce the original docu-

ment. Examination of the original document revealed that the plaintiffs had signed their names beneath a typewritten statement setting out the request that "legal action be taken to secure my claim for me due me under the Fair Labor Standards Act." Thus the original document demonstrated clearly that the plaintiffs, by signing their names, had in fact given their consent to becoming plaintiffs in a suit for recovery under the Act. In addition, the only testimony adduced on this point indicated that the plaintiffs, though unschooled in legal technicalities, had a basic understanding of the nature of the consent they were giving by their signatures.

Nevertheless, defendants contend that the list of signatures originally filed was deficient in that it was not the *original* document itself. In support of this contention defendants cite Kulik v. Superior Pipe Specialties Co., N.D.Ill.1962, 203 F.Supp. 938. In *Kulik* the court held that the statute of limitations was not tolled by the filing of a *typewritten* list of the names of the plaintiffs. Thus it is obvious that *Kulik* is readily distinguishable from the present case. The argument can logically be made that a typewritten list does not prove that the plaintiffs have ever signed anything; such a list proves only that the lawyer who drafted the complaint has learned the names of the plaintiffs. A xerox copy, however, being a reproduction of the signatures themseves, is probative of the fact that the plaintiffs have executed their signatures prior to the filing of the complaint.

In the present case the filing of the xerox copy with the original complaint proved that the plaintiffs had signed *something* prior to the filing of the complaint, and defendants have never challenged the authenticity of the signatures themselves. However, since it was clear that the plaintiffs had not actually signed the *complaint,* defendants demanded the production of the original document in order to ascertain what the plaintiffs had signed. The plaintiffs, by producing the original

document, established clearly that their intent in signing their names had been to evidence their consent to becoming parties plaintiff to an action under the Fair Labor Standards Act. In these circumstances we cannot hold that each plaintiff's act of signing the document was a futile exercise in penmanship. On the contrary, we agree with the district court that the filing of the xerox copy of the signatures, the intent of which was proved when challenged, constituted "written consent" on the part of the plaintiffs sufficient to toll the statute of limitations.

 Since we uphold the trial court's finding that the statute was tolled on the ground that the written consent was in full compliance with the statutory provisions, we need not consider the contention advanced by the plaintiffs and the Secretary that no written consents were required in this case.[13]

### III.

The final question presented by this appeal is the matter of attorneys' fees. Section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), provides that the court in any action brought by employees under the Act "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant * * *." Pursuant to this statutory mandate the district court awarded attorneys' fees in the amount of fifteen percent of the sums recovered by the plaintiffs.

Defendants now object to this award of attorneys' fees, not on the ground that

the amount awarded was excessive or unwarranted, but on the ground that attorneys' fees cannot be awarded unless the trial court hears *evidence* concerning the value of the attorneys' services. In support of this proposition defendants cite only one case, Hayes v. Bill Haley and His Comets, Inc., E.D.Pa.1967, 274 F.Supp. 34. In *Hayes* the district court entered judgment for the plaintiff, but declined to award attorney's fees. The court stated:

"An award of attorney's fees and costs of an action are also made to an employee if he recovers against his employer for violation of the Act. The Court is required to allow a reasonable attorney's fee in addition to the judgment entered. The amount ultimately lies on the discretion of the Court and depends generally upon the extent of the work done by counsel and the amount recovered. *There was no proof at trial as to the attorney's fees and accordingly, no recovery is allowed.*" 274 F.Supp. at 37 (emphasis added).

If the court in *Hayes* meant to say merely that it was unable *in that particular case* to assess counsel fees unless evidence was first introduced to show the amount to which the attorney was entitled, then *Hayes* does not support the principle asserted by defendants in the present case. If, however, the court in *Hayes* meant to say that attorneys' fees under the Act can *never* be awarded in the absence of evidence, then we are compelled to conclude that *Hayes* is simply wrong.

 Although a district court *may* receive evidence relating to the award of

13. On the basis of their contention that written consents were not necessary in this case, plaintiffs advance in their brief an argument concerning two former plaintiffs whose claims were dismissed in the trial court. These former parties were named in the amended complaint, but their signatures were never filed. Accordingly, prior to judgment in the court below they were dismissed as parties plaintiff, on motion of their own counsel, on the ground that they had never given their written consent to the bringing of the action.

On appeal, however, plaintiffs take the position that written consents were not necessary at all, and in keeping with this position they argue that the two former plaintiffs should "be allowed to recover on their valid claims." The answer to this argument is that the two former plaintiffs are not properly before this court in any way; they are no longer parties to the action. As non-parties, they cannot be injected into this litigation at the appellate level.

attorneys' fees if the court deems it necessary, it is well established that the court in Fair Labor Standards Act cases is not *required* to hear such evidence. Day & Zimmerman, Inc. v. Reid, 8 Cir. 1948, 168 F.2d 356, 360–361 (specifically rejecting the employer's contention that "the trial court erred in awarding attorney fees without evidence concerning the value of the attorney's services"). See Crago v. Rockwell Mfg. Co., W.D. Pa.1969, 301 F.Supp. 743, 748; Sikes v. Williams Lumber Co., E.D.La.1954, 123 F.Supp. 853, 856; Ivey v. Foremost Dairies, Inc., W.D.La.1952, 106 F.Supp. 793, 798, rev'd in part on other grounds, 5 Cir. 1953, 204 F.2d 186; Kerew v. Emerson Radio & Phonograph Corp., S.D. N.Y.1947, 76 F.Supp. 197. See also Campbell v. Green, 5 Cir. 1940, 112 F.2d 143, 144; Stanolind Oil & Gas Co. v. Guertzgen, 9 Cir. 1938, 100 F.2d 299, 302–303.

The rule that a trial court may award attorneys' fees without receiving evidence concerning the proper amount is not grounded in judicial arrogance. There is simply no good reason why a court should be required to subordinate its own expertise in the matter to that of others. A trial court has firsthand knowledge of the proceedings before it and is thus clearly qualified to "place a value on [the attorney's] services without opinion evidence of an expert witness on the subject." Day & Zimmerman, Inc. v. Reid, *supra*, 168 F.2d at 361. In the present case it is obvious that the court was completely familiar with the nature of the case and with the amount of time and effort required to represent the plaintiffs adequately. See Van Dyke v. Bluefield Gas Co., 4 Cir. 1954, 210 F.2d 620, 622, cert. denied, 347 U.S. 1014, 74 S.Ct. 870, 98 L.Ed. 1137. Common sense dictates that a court's knowledge and experience need not be cast into limbo. We therefore uphold the district court's award of a fee to compensate plaintiffs' attorneys for their services in the court below.

There remains the question of attorneys' fees for this appeal. An additional fee to compensate counsel for their services in connection with the appeal can be awarded in a Fair Labor Standards Act case when the appellate court considers such an award appropriate. See, e. g., Bable v. T. W. Phillips Gas and Oil Co., 3 Cir. 1961, 287 F.2d 21, 25; Holtville Alfalfa Mills, Inc. v. Wyatt, 9 Cir. 1955, 230 F.2d 398, 400–401; Meier & Pohlmann Furniture Co. v. Troeger, 8 Cir. 1952, 195 F.2d 193, 195; Republican Publishing Co. v. American Newspaper Guild, 1 Cir. 1949, 172 F.2d 943, 946; Day & Zimmerman, Inc. v. Reid, *supra*, 168 F.2d at 361; Aaron v. Bay Ridge Operating Co., 2 Cir. 1947, 162 F.2d 665, 670, modified on other grounds, 1948, 334 U.S. 446, 68 S.Ct. 1186, 92 L. Ed. 1502; E. H. Clarke Lumber Co. v. Kurth, 9 Cir. 1945, 152 F.2d 914, 915. But see, e. g., Glenn L. Martin Nebraska Co. v. Culkin, 8 Cir. 1952, 197 F.2d 981, 988, cert. denied 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 671; United States Steel Co. v. Burkett, 4 Cir. 1951, 192 F.2d 489, 492; Handler v. Thrasher, 10 Cir. 1951, 191 F.2d 120, 123.

We think an additional fee for the appeal in this case is clearly merited. A mastery of the issues raised by the defendants obviously required considerable study and research on the part of plaintiffs' attorneys. Moreover, we take note of the fact that these attorneys received no assistance from the Department of Labor in the preparation of plaintiffs' brief to this court; the Secretary's *amicus* brief was not prepared until after the plaintiffs' brief had been filed. In the circumstances of this case, an additional allowance for the attorneys' services on appeal is clearly warranted.

This court, of course, can make its own assessment of the amount to be awarded as attorneys' fees on appeal. See, e. g., Bable v. T. W. Phillips Gas and Oil Co., *supra*, 287 F.2d at 25; Republican Publishing Co. v. American Newspaper Guild, *supra*, 172 F.2d at 946; Day & Zimmerman, Inc. v. Reid, *supra*, 168 F.2d at 361. In this particular case, however, the state of the record is such

that we are doubtful of our ability to make an accurate assessment of the amount to be awarded. We therefore remand to the district court with instructions to that court to assess the amount to be awarded as additional attorneys' fees for this appeal. The district court may receive evidence concerning the matter if it considers such evidence necessary or helpful.

The judgment of the district court is in all respects affirmed, and the cause is remanded to the district court for the assessment of attorneys' fees to be awarded for this appeal.

Affirmed.